**Kerry J. Shepherd, OSB #944343**
KerryShepherd@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
*Attorneys for Plaintiff Patrick Ayers*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PATRICK AYERS, derivatively on behalf of NIKE, INC., | Case No. 3:24-cv-1269 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND JURY TRIAL** |
| MARK G. PARKER; JOHN J. DONAHOE II; CATHLEEN BENKO; TIMOTHY COOK; THASUNDA B. DUCKETT; MÓNICA GIL; ALAN B. GRAF, JR.; MARIA HENRY; PETER B. HENRY; TRAVIS A. KNIGHT; MICHELLE A. PELUSO; JOHN W. ROGERS, JR.; and ROBERT SWAN, | |
| Defendants, | |
| and | |
| NIKE, INC., | |
| Nominal Defendant. | |

Plaintiff Patrick Ayers ("Plaintiff"), by and through his attorneys, hereby submits this

Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant

NIKE, Inc. ("NIKE" or "Company"), against certain current and former members of its Board of

Directors (the "Board") and executive officers seeking to remedy Defendants Mark G. Parker,

John J. Donahoe II, Cathleen Benko, Timothy Cook, Thasunda B. Duckett, Mónica Gil, Alan B.

Graf, Jr., Maria Henry, Peter B. Henry, Travis A. Knight, Michelle A. Peluso, John W. Rogers,

Jr., and Robert Swan's ("Defendants" or "Individual Defendants" or "Parties") breaches of

fiduciary duties and unjust enrichment, from March 19, 2021 through the present (the "Relevant

Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of

counsel, which included, among other things, review and analysis of: a) public filings made by

NIKE and other related parties and non-parties with the Securities and Exchange Commission

("SEC"); b) press releases and other publications disseminated by certain of the Defendants and

other non-parties; c) news articles, shareholder communications and postings on NIKE's

website; d) publicly available filings in a related securities class action lawsuit captioned *City

Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines v. Nike Inc. et

al.*, No. 3:24-cv-00974, in the U.S. District Court for the District of Oregon (the "Securities

Action"); and e) other publicly available information concerning NIKE and the Individual

Defendants (defined below under "Parties.") Plaintiff believes that substantial evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      NIKE is an Oregon corporation with its principal executive offices in Beaverton,

Oregon. NIKE is a global athletic footwear and apparel company which designs, markets, and

sells products that are sold through wholesale partners, distributors and licensees as well as

Company retail stores and NIKE Brand Digital platforms, including NIKE.com and its digital

application, NIKE+ ("NIKE Digital").

2.      In 2017, NIKE initiated its "Consumer Direct Offense" strategy, centered on increasing both innovation and direct connections with consumers.  Consumer Direct Offense also emphasized the Company's digital presence as a means of directly connecting with consumers, as reflected by the fact that NIKE began reporting the financial metrics from NIKE Digital and the Company's retail stores as "NIKE Direct."  This direct-to-consumer strategy led the Company to drop nearly one-third of its sales partners by late 2020 and significantly reduce sales to other major retail clients.

3.      Throughout the Relevant Period, NIKE touted the Company's new business model and its associated growth, while downplaying significant competitive pressures.

4.      While announcing the Company's financial results for the third quarter of fiscal year 2021, President and Chief Executive Officer ("CEO") defendant John J. Donahoe II stated "NIKE continues to deeply connect with consumers all over the world driven by our strong competitive advantages" and that "[o]ur strategy is working, as we accelerate innovation and create the seamless, premium marketplace of the future."  The Company's Executive Vice President and Chief Financial Officer ("CFO"), Matthew Friend, boasted that "NIKE's brand momentum is as strong as ever and we are driving focused growth against our largest opportunities."

5.      NIKE's inability to generate sustainable revenue growth began to surface on June 27, 2022 when the Company's fourth quarter and full year 2022 financial results release revealed that quarterly revenues declined 1% year-over-year and quarterly wholesale revenues declined 7% year-over-year.

6.      Notwithstanding this news, Donahoe assured investors that NIKE's "strategy is working" by creating value through its "competitive advantages, including [its] pipeline of

innovative product[s] and expanding digital leadership."  Still, Donahoe asserted that NIKE's new business strategy had management "very confident in our long-term strategy and our growth outlook."  On this news, the price of NIKE Class B common stock declined nearly 7%, or $7.72 per share, from a close of $110.50 per share on June 27, 2022, to close at $102.78 per share on June 28, 2022.

7.      In September 2022, NIKE reported its first quarter fiscal year 2023 financial earnings, which included a net income decline of 22% year-over-year and diluted earnings per share ("EPS") similarly down 20% year-over-year.  NIKE also reported a gross margin reduction of a whopping 220 basis points year-over-year driven by the disposal of inventory, which was 44% higher than in the first quarter of 2022.  On this news, the price of NIKE Class B common stock declined nearly 13% more, $12.21 per share, from a close of $95.33 per share on September 29, 2022, to close at $83.12 per share on September 30, 2022.

8.      Still, the Company continued to tout the purported strength of its business model, claiming that, for example, "competitive advantages continue to fuel our momentum" and that the Company was primed to "leverage our competitive advantages to not only gain share but also grow the market."

9.      In December 2023, when the Company issued its disappointing second quarter fiscal year 2024 financial results which, among other things, forced CFO Friend finally to concede that NIKE's "total retail sales across the marketplace fell short of our expectations," and that its digital platforms lost consumer traffic to competitors because of "higher promotional activity across the marketplace."  Given these challenges, CFO Friend informed investors that NIKE was "adjusting [its] channel growth plans for the remainder of the year" and "identifying opportunities across the company to deliver up to $2 billion in cumulative cost savings over the

next 3 years." On this news, the price of NIKE Class B common stock declined nearly 12%, or $14.49 per share, from a close of $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

10.     Then, on March 21, 2024, NIKE announced its third quarter fiscal year 2024 financial results, including a 3% year-over-year revenue decline in its Europe, Middle East, and Africa ("EMEA") segment, a 3% year-over-year decline in NIKE Digital revenue, and quarterly revenue growth of just 0.4% year-over-year in NIKE Direct. On the same-day investor earnings call, Donahoe admitted that "NIKE is not performing [to its] potential" despite moments earlier claiming that "Q3 performed in line with our expectations." Donahoe further revealed that NIKE decided to reduce reliance on its direct-to-consumer strategy and "lean in with our wholesale partners to elevate our brand and grow the total marketplace," explaining that the Company made a "reinvestment with our wholesale partners, so we bring a more holistic offense that grows the market and gets in the path of our consumer." Furthermore, CFO Friend stated that the Company was "prudently planning for revenue in the first half of the fiscal year [2025] to be down low single digits" as the Company "shift[s] product portfolio toward newness and innovation." On this news, the price of NIKE Class B common stock declined 7%, or $6.96 per share, from a close of $100.82 per share on March 21, 2024, to close at $93.86 per share on March 22, 2024.

11.     As alleged below, throughout the Relevant Period, the Individual Defendants (defined below) endorsed or otherwise allowed NIKE to issue statements that were materially false and/or misleading, and/or failed to disclose material adverse facts, about the Company's business and operations. Specifically, on Individual Defendants' watch, the Company misrepresented and/or failed to disclose: (1) the inability of NIKE's direct-to-consumer strategy

to generate sustainable revenue growth; (2) the failure of the Company's purported competitive advantages to protect the Company from intense competitive pressures following the alienation of its wholesale and retail partners; and (3) as a result, the Company's representations about NIKE's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

12.     As a result of Individual Defendants' wrongful acts and omissions, NIKE has suffered significant financial and reputational damages.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     This Court has jurisdiction over each Defendant because they reside in this district or have sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to

Veradigm occurred in this district, and Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## PARTIES

16.     Plaintiff is a current shareholder of NIKE and has continuously held NIKE common stock since September 4, 2018.  Plaintiff is a citizen of Pennsylvania.

17.     Nominal Defendant NIKE is an Oregon corporation with its principal offices located in Beaverton, Oregon. NIKE's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NKE."

18.     Defendant, Mark G. Parker ("Parker"), is the Chairman of the Company's Board of Directors and has served as a director since 2006.  Parker also served as Nike's President and Chief Executive Officer from 2006-2020.  Upon information and belief, Parker is a resident of Florida.

19.     Defendant, John J. Donahoe, II, is Nike's President and CEO and has been a director since 2014.  Donahoe is a member of the Company's Executive Committee.  Upon information and belief, Donahoe is a resident of Colorado.

20.     Defendant, Cathleen Benko ("Benko"), has served as a Nike Board member since 2018 and is a member of its Compensation Committee.  Upon information and belief, Benko is a resident of California.

21.     Defendant, Timothy Cook ("Cook"), has served as a Nike Board member since 2005 and is the Company's Lead Independent Director.  Cook also is Chairman of the Board's Compensation Committee.  Upon information and belief, Cook is a resident of California.

22.     Defendant, Thasunda B. Duckett ("Duckett"), has served as a Nike Board member since 2019 and is a member of its Corporate Responsibility, Sustainability & Governance Committee.  Upon information and belief, Duckett is a resident of New York.

23.     Defendant, Mónica Gil ("Gil"), has served as a Nike Board member since September 2022 and is a member of its Compensation Committee.  Upon information and belief, Gil is a resident of Florida.

24.     Defendant, Alan B. Graf, Jr. ("Graf"), has served as a Nike Board member since 2002 and is Chairman of its Audit & Finance Committee.  Upon information and belief, Graf is a resident of Florida.

25.     Defendant, Maria Henry ("M. Henry"), has served as a Nike Board member since June 2023 and is a member of its Audit & Finance Committee.  Upon information and belief, M. Henry is a resident of Florida.

26.     Defendant, Peter B. Henry ("P. Henry"), has served as a Nike Board member since 2018 and is a member of its Audit & Finance Committee.  Upon information and belief, P. Henry is a resident of California.

27.     Defendant, Travis A. Knight ("Knight"), son of founder Phillip Knight, has served as a Nike Board member since 2015 and is a member of its Executive Committee.  Upon information and belief, Knight is a resident of Oregon.

28.     Defendant, Michelle A. Peluso ("Peluso"), has served as a Nike Board member since 2014 and is Chairwoman of its Corporate Responsibility, Sustainability & Governance Committee.  Upon information and belief, Peluso is a resident of New York.

29.     Defendant, John W. Rogers, Jr., ("Rogers") has served as a Nike Board Member since 2018 and is a member of its Audit & Finance Committee.  Upon information and belief, Rogers is a resident of Illinois.

30.     Defendant, Robert Swan, ("Swan") has served as a Nike Board member since September 2022 and is a member of its Audit & Finance Committee.  Upon information and belief, Swan is a resident of California.

31.     Defendants Parker, Donahoe, Benko, Cook, Duckett, Gil, Graf, M. Henry, P. Henry, Knight, Peluso, Rogers and Swan are referred to herein as the "Individual Defendants."

32.     Defendants Graf, M. Henry, P. Henry, Rogers and Swan are referred to herein as the "Audit Defendants."

<b>INDIVIDUAL DEFENDANTS' DUTIES</b>

33.     By reason of their positions as officers, directors, and/or fiduciaries of NIKE, and because of their ability to control the business and corporate affairs of NIKE, Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage NIKE in a fair, just, honest and equitable manner.

34.     Further, Individual Defendants were and are required to act in furtherance of the best interests of NIKE and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit.  Each director and officer of the Company owes to NIKE and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

35.     Because of their positions of control and authority as directors and/or officers of NIKE, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  To discharge their duties, the officers and directors of NIKE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties the officers and directors of NIKE were required to, among other things:

a.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

c.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

36.     NIKE's Corporate Governance Guidelines state, in relevant part:

Role of the Board: The Board, which is elected by shareholders, is the ultimate decision-making body of the Company, except with respect to those matters reserved to the shareholders.  The Board's goals are to build long-term shareholder value, including by promoting the sustainability of the Company, and to responsibly address the concerns of shareholders and other stakeholders, including employees, consumers, customers, suppliers, governments, local communities and the general public.

The Board elects the corporate officers comprising the senior management team, who are responsible for the conduct of the Company's business.  The Board acts

as an advisor to and oversees the performance of the senior management team in order to ensure management continues to effectively execute its duties.

Oversight Responsibilities: In addition to its general oversight of management, the Board also performs a number of specific functions, directly or through its committees, including:

> Corporate Integrity and Compliance: The Board is responsible for reviewing and establishing procedures designed to ensure that the Company's management and employees operate in a legal and ethically responsible manner.

> Strategy Oversight: Normally it is management's duty to formalize, propose and implement strategic choices, and the Board's role to approve strategic direction and evaluate strategic results. The Board believes it is important to be deeply engaged and involved in overseeing the Company's long-term strategy and business initiatives and that the Company's business strategies and prospects should be discussed as a matter of course at regular board meetings with updates on significant items being provided in between regular board meetings, in addition to periodic more intensive sessions regarding matters of corporate strategy and performance. To accomplish this, the Board engages in a regular dialogue with the Company's Chief Executive Officer ("CEO") and other members of the senior management team. The Board regularly reviews with the senior management team the Company's long-term strategic business plans, prospects and other significant issues affecting the business of the Company.

> Risk Oversight: While the Company's management team is responsible for day-to-day management of the various risks facing the Company, the Board takes an active role in the oversight of the management of key business risks. The Board implements its risk oversight function both as a whole and through committees, which play a significant role in carrying out risk oversight. While the Audit & Finance Committee is responsible for oversight of management's risk management policies, oversight responsibility for particular areas of risk is allocated among the Board committee according to the committee's areas of responsibility as reflected in the committee charters.

ROLE OF DIRECTORS

The core responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders and in compliance with all applicable laws and regulations. Directors are expected to spend the time and effort necessary to properly discharge their

responsibilities, including by attending meetings of the Board and committees on which he or she sits and reviewing materials distributed in advance of each meeting.

37.    The Audit and Finance Committee Charter states:

The purposes of the Audit & Finance Committee (the "Committee") of the Board of Directors (the "Board") of NIKE, Inc. (the "Company") are to assist the Board in fulfilling its legal and fiduciary obligations with respect to:

> •    matters involving the accounting, auditing, financial reporting and internal controls of the Company;
>
> •    activities of the Company that may have a material impact on the Company's financial position;
>
> •    financial policies and the integrity of the Company's financial statements;
>
> •    the Company's compliance with legal and regulatory requirements;
>
> •    the independent auditor's qualifications and independence;
>
> •    the performance of the Company's internal audit function and independent auditor;
>
> •    the Company's risk assessment and risk management processes and practices; and
>
> •    the preparation of the report of the Audit Committee required to be included in the Company's annual proxy statement.

The function of the Committee is oversight.  Thus, it is not the duty of the Committee to plan or conduct audits, to ensure the integrity of the Company's financial statements or the effectiveness of internal control over financial reporting.  Rather, management and the internal auditing department are responsible for maintaining appropriate accounting and financial reporting principles and policies, internal controls and procedures that provide for compliance with accounting standards and applicable laws and regulations, and the planning and conduct of audits.

In fulfilling their responsibilities hereunder, it is recognized that members of the Committee are not full-time employees of the Company and are not, and do not represent themselves to be, performing the functions of auditors or accountants. As such, it is not the duty or responsibility of the Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards.

\*        \*        \*

DUTIES AND RESPONSIBILITIES

The Committee will have the following duties and responsibilities:

\*        \*        \*

FINANCIAL STATEMENTS AND PUBLIC REPORTING

To review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

To review the Company's Annual Report to be filed with the SEC on Form 10-K, and recommend to the Board that the audited financial statements be included in the Form 10-K.

To discuss with the Chief Executive Officer and the Chief Financial Officer the individual certifications required to be filed with the Company's periodic reports to the SEC.

To review and discuss with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

RISK OVERSIGHT

To discuss with management the Company's major risk exposures and policies with respect to risk assessment and risk management, including risks related to information security and data protection, and the steps management has taken to monitor and control such exposures.

To meet periodically with the Chief Information Officer or Chief Information Security Officer to review risks related to information security and data protection.

To review and approve policies and procedures for managing the Company's financial (*i.e.*, interest rate and foreign exchange), casualty and liability risks, including policies and procedures relating to hedging and the use of swaps and other derivatives.

INTERNAL AUDIT AND INTERNAL CONTROLS

To review and approve, if appropriate, the internal audit charter and any changes thereto.

To set hiring policies for employees or former employees of the independent auditor in accordance with applicable legal requirements

To ensure that the Chief Internal Auditor is independent of the Company's management and to concur in the selection, retention, and dismissal of the Chief Internal Auditor.

To review management's assessment of the effectiveness of the Company's accounting and internal control structure and procedures.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

38.    NIKE is an Oregon corporation with its principal executive offices in Beaverton, Oregon.  It is a global athletic footwear and apparel company which designs, markets, and sells products for its NIKE, Jordan, and Converse brands.  The Company's NIKE branded products are sold through its retail stores, NIKE Digital, wholesale partners, distributors and licensees.

39.    Historically, NIKE emphasized three "competitive advantages" as the basis for its success—"a culture deeply rooted in innovation, a brand that deeply connects with consumers fueled by compelling storytelling and an unmatched sports marketing portfolio."

40.    In 2017, NIKE began implementing its "Consumer Direct Offense" strategy, which focused on increasing innovation and direct connections with consumers.  The Consumer Direct Offense also emphasized NIKE's digital presence as a means of directly connecting with consumers by "add[ing] greater digital expertise and control in the markets where consumer connections happen."  In fact, the Company began reporting the financial metrics from NIKE Digital and the Company's retail stores as one segment—"NIKE Direct."  NIKE Direct is divided into four geographic operating segments: North America; EMEA; Greater China; and Asia Pacific & Latin America.

41.    On June 25, 2020, Defendants announced a second phase to Consumer Direct Offense—"Consumer Direct Acceleration"—the Company's "new digitally empowered phase of our consumer direct strategy" intended to provide consumers with a "consistent, seamless physical and digital experience."

42.     According to the Company, the acceleration of NIKE's direct-to-consumer strategy more closely aligned NIKE's designs and products with consumer preferences, and optimized the Company in several areas, including, inter alia, "data and analytics, demand sensing, insight gathering," and inventory management, to accelerate NIKE's "digital transformation."

43.     In connection with the acceleration of NIKE's direct-to-consumer strategy, NIKE dropped nearly one-third of its sales partners by late 2020, and significantly reduced sales to retail clients, such as Foot Locker, DSW, and Macy's, in order to shift the Company toward direct-to consumer sales and away from reliance on wholesale partners.  NIKE Direct is intended to be the centerpiece of NIKE's long-term financial plans and has been touted by Donahoe as NIKE's "fourth emerging competitive advantage."

44.     NIKE's Class B common stock trades on the NYSE under the ticker symbol "NKE."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

45.     The Relevant Period begins on March 19, 2021, one day after NIKE issued, and filed with the SEC on Form 8-K, its third quarter fiscal year 2021 financial results after market hours ("3/18/21 8-K").  In the 3/18/21 8-K, the Company highlighted a 3% year-over-year increase in quarterly revenues "led by Greater China reported revenue growth of 51 percent" and "NIKE Brand digital sales increased 59 percent . . . with strong double-digit increases in all geographies."  Donahoe also touted the Company's "strong competitive advantages" as the driving force behind NIKE's continued success, while CFO Friend assured investors that "NIKE's brand momentum is as strong as ever, and we are driving focused growth against our largest opportunities."

46.     During an investor call the Company held to discuss the 3/18/21 8-K, also after hours on March 18, 2021, Donahoe emphasized NIKE's "tremendous success in digital," including the Company's "digital transformation," as its "unique advantage" to power its global brand.

47.     On June 24, 2021, NIKE issued, and filed with the SEC on Form 8-K, a its fourth quarter and full fiscal year 2021 financial results after market close ("6/24/21 8-K").  In the 6/24/21 8-K, Donahoe boasted that "NIKE's strong results this quarter and full fiscal year demonstrate NIKE's unique competitive advantage and deep connection with consumers all over the world."  The 6/24/21 8-K focused on the importance of the Company's digital presence, with CFO Friend noting that "NIKE's brand momentum is a testament to our authentic consumer connections, digital strength and continued operational execution," and that, "[a]s we advance our consumer-led digital transformation, we are building a new financial model that will continue to fuel long-term sustainable, profitable growth for NIKE."

48.     Also on June 24, 2021, NIKE held an investor earnings call, during which Donahoe reiterated that NIKE's "strong business results proved yet again NIKE's unique competitive advantage" and touted "we are better positioned to drive sustainable long-term growth than we were before the pandemic" and "[o]ur relentless pipeline of innovative products continues to create separation between us and our competition."  CFO Friend discussed NIKE's Consumer Direct Acceleration strategy, explaining that the Company will make an "accelerated shift to a more direct member-centric business model" where NIKES's revenue "[g]rowth will be led by NIKE Direct and our strategic marketplace partners" intending that NIKE Direct "represent approximately 60% of the business in fiscal '25, led by growth in digital."

**Page 16 –**      **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

49.     On December 20, 2021, NIKE issued, and filed with the SEC on Form 8-K, its second quarter fiscal year 2022 financial results after market close.  On the Company's investor earnings call held the same day, Donahoe emphasized that "[t]he results we delivered offered continued proof that our strategy is working" and highlighted NIKE's digital presence as its "fourth emerging competitive advantage . . . as we are one of the few brands that can directly connect with and serve consumers at scale" ("12/20/21 Investor Call").

50.     Also during the 12/20/21 Investor Call, Donahoe further touted NIKE's competitive position, stating that the Company's "digital penetration is at an all-time high," leading to a "direct connection with the consumer" that is ultimately "strengthening and strengthening [NIKE's brand] against our historical competitors."

51.     On March 21, 2022, NIKE issued, and filed with the SEC on Form 8-K, its third quarter fiscal year 2022 financial results after market close.  During the accompanying investor earnings call held that same day, Donahoe stressed NIKE's "growing digital advantage," particularly as Defendants "continue to drive greater competitive separation" through the Company's digital presence and, while NIKE's third quarter fiscal year 2022 revenues in Greater China were down 8% year-over-year, CFO Friend sought to reassure investors that "NIKE was rated the #1 cool and #1 favorite brand in China, creating separation and distinction versus the competition."

52.     The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts, about the Company's business and operations.  Specifically, on Individual Defendants' watch, the Company misrepresented and/or failed to disclose: (1) the inability of NIKE's direct-to-consumer strategy to generate sustainable revenue growth; (2) the failure of the Company's purported competitive advantages to protect the Company from intense

competitive pressures following the alienation of its wholesale and retail partners; and (3) as a result, the Company's representations about NIKE's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

### THE TRUTH BEGINS TO BE REVEALED

53.    Investors began to learn the truth about NIKE's direct-to consumer strategy on June 27, 2022, when NIKE issued, and filed with the SEC on Form 8-K, its fourth quarter and full fiscal year 2022 financial results after market close ("6/27/22 8-K").  NIKE's quarterly revenues declined 1% year-over-year and quarterly wholesale revenues declined 7% year-over-year.  Likewise, according to the 6/27/22 8-K, NIKE's quarterly gross margin declined 80 basis points year-over-year, "primarily due to higher inventory obsolescence reserves in Greater China and elevated freight and logistics costs," and the Company's 2022 gross margin growth of 120 basis points year-over-year was significantly below expectations.

54.    Also in the 6/27/22 8-K, Donahoe claimed that, in NIKE's "competitive advantages, including our pipeline of innovative product and expanding digital leadership, prove that our strategy is working as we create value through our relentless drive to serve the future of sport," notwithstanding the Company's poor performance.

55.    Then, on the investor earnings call that accompanied the 6/27/22 8-K on June 27, 2022, Donahoe stated that, "as we look ahead to fiscal '23, we remain very confident in our long-term strategy and our growth outlook."  In response to an analyst's question about NIKE's outlook in China, Donahoe downplayed concerns by noting that "[w]e've always taken a long-term view" in China and that NIKE is China's "#1 cool brand."

56.     On this news, the price of NIKE Class B common stock declined nearly 7%, or $7.72 per share, from $110.50 per share at close on June 27, 2022, to $102.78 per share at close on June 28, 2022.

57.     On September 29, 2022, NIKE issued, and filed with the SEC on Form 8-K, disappointing first quarter fiscal year 2023 financial results after market close ("9/29/22 8-K"). In the 9/29/22 8-K, NIKE reported significant year-over-year declines in net income (22%), diluted EPS (20%), and gross margin (220 basis points), with only a meager increase in NIKE's quarterly revenue (4%). The Company further disclosed that its gross margin was primarily impacted by the disposal of excess inventory (which was 44% higher than the same period in 2022), causing CFO Friend to acknowledge that "we've decided to take that inventory and more aggressively liquidate it."

58.     Nonetheless, on the accompanying investor earnings call, held that same day, as the 9/29/22 8-K was issued, Donahoe explained to investors that the industry was experiencing a "period of turbulence" where NIKE "want[s] to leverage our strengths to emerge in a stronger position than our competition at the other end of it," noting "[w]e've got a really strong innovation pipeline. So we talk about the transitional and the structural. The transitional is navigating through the inventory situation. The structural is leveraging our competitive advantages so we emerge in a stronger position, and we'll be playing offense on both."

59.     On this news, the price of NIKE Class B common stock further declined nearly 13%, or $12.21 per share, from $95.33 per share at close on September 29, 2022, to $83.12 per share at close on September 30, 2022.

60.     On December 20, 2022, NIKE issued, and filed with the SEC on Form 8-K, its second quarter fiscal year 2023 financial results after market close ("12/20/22 8-K"). The

**Page 19 –     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

12/20/22 8-K included positive boasts about NIKE's growth strategy, including Donahoe claiming that "NIKE's results this quarter are a testament to our deep connection with consumers," "[o]ur growth was broad-based and was driven by our expanding digital leadership and brand strength," and that "[t]hese results give us confidence in delivering the year as our competitive advantages continue to fuel our momentum."  Additionally, CFO Friend stated that "[c]onsumer demand for NIKE's portfolio of brands continues to drive strong business momentum in a dynamic environment" and that Defendants are "on track to deliver on our operational and financial goals — setting the foundation for sustainable, profitable growth."

61.    Also on December 20, 2022, NIKE hosted an investor earnings call, during which Donahoe highlighted that NIKE is "creating more separation between us and our competition thanks to the meaningful relationships we have with consumers and the continued success of our strategy."

62.    The above statements were materially false and misleading, and failed to disclose materially adverse facts, about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) NIKE's direct-to consumer strategy was unable to generate sustainable revenue growth; (2) NIKE's competitive advantages were unable to protect the Company from intense competitive pressures after NIKE largely disengaged from many of its wholesale and retail partners to focus on the Company's direct-to-consumer strategy; and (3) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

### THE TRUTH IS REVEALED INVESTORS

63.    Investors began to learn more about NIKE's inability to generate sustainable revenue growth through its Consumer Direct Offense strategy on December 21, 2023, when the

Company announced its second quarter fiscal year 2024 financial results after market close. Specifically, the Company announced 1% total revenue growth year-over-year, which was dragged down by quarterly revenue declines in North America and EMEA.  Additionally, during the accompanying investor earnings call held that same day, CFO Friend revealed that NIKE's "[t]otal retail sales across the marketplace fell short of our expectations" and that NIKE's digital platforms lost consumer traffic to competitors because of "higher levels of promotional activity across the marketplace."  Given these challenges, CFO Friend revealed that NIKE was "adjusting [its] channel growth plans for the remainder of the year" and "identifying opportunities across the company to deliver up to $2 billion in cumulative cost savings over the next 3 years," including improving the Company's supply chain efficiency and "streamlining [its] organizational structure."

64.    On this news, the price of NIKE Class B common stock declined $14.49 per share, or nearly 12%, from a close of $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

65.    On March 21, 2024, NIKE announced its third quarter fiscal year 2024 financial results after market close, revealing a 3% year-over-year decline in EMEA revenue, a 3% year-over-year decline in NIKE Digital revenue, and scant quarterly revenue growth of just approximately 0.4% year-over-year in NIKE Direct.  Donahoe, on the accompanying investors earnings call held that same day, admitted that "NIKE is not performing in our potential."  He then revealed that, "while NIKE Direct will continue to play a critical role, we must lean in with our wholesale partners to elevate our brand and grow the total marketplace."  Furthermore, Donahoe stated that "we're combining both the best of our direct offense but a reinvestment with our wholesale partners, so we bring a more holistic offense that grows the market and gets in the

path of our consumer." CFO Friend then informed investors that "we are prudently planning for revenue in the first half of the fiscal year [2025] to be down low single digits."

66.     On this news, the price of NIKE Class B common stock declined $6.96 per share, or nearly 7%, from a close of $100.82 per share on March 21, 2024, to close at $93.86 per share on March 22, 2024.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiff brings this action derivatively in the right and for the benefit of NIKE to redress Individual Defendants' breaches of fiduciary duty and other violations of law.

68.     Plaintiff will adequately and fairly represent the interests of NIKE and its shareholders in enforcing and prosecuting its rights.

69.     The Board currently consists of the following thirteen directors: Defendants Parker, Donahoe, Benko, Cook, Duckett, Gil, Graf, M. Henry, P. Henry, Knight, Peluso, Rogers and Swan.

70.     Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

a.     The Individual Defendants face a substantial likelihood of liability for, among other things, approving or otherwise not preventing NIKE's issuance of its financial and related statements that, among other things, failed to disclose that: (1) NIKE's direct-to-consumer strategy was unable to generate sustainable revenue growth; (2) NIKE's purported competitive advantages were unable to protect the Company from intense competitive pressures after NIKE largely disengaged from many of its wholesale and retail partners to focus on the Company's direct-to-consumer strategy; and (3) as a result, Defendants' representations about the

Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

       b.      During various times of the Relevant Period, pursuant to the Company's Audit Committee Charter, the Audit Defendants were and are responsible for, among other things, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and failed to recognize or correct NIKE's internal control failures. Therefore, the Audit Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

       c.      Moreover, the Audit Committee Defendants failed to maintain the level of oversight required, including that the requirements that the Audit Committee discuss with management and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements and as appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

       d.      The principal professional occupation of Donahoe is his employment with NIKE, pursuant to which he has received, and continue to receive, substantial monetary compensation and other benefits.

       e.      Knight is not independent for purposes of considering a demand due to his familial connection with the Company's founder, Phil Knight.  Phil Knight remains involved

with the Company, currently serving as Chairman Emeritus of the Board of Directors and attends meetings of the Board as a non-voting observer.

## COUNT I

### AGAINST INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

71.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.     As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to NIKE shareholders materially misleading and inaccurate information through, inter alia, SEC filings, press releases, conference calls and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

73.     Also as alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

74.     Individual Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with NIKE's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

75.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages.  Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### AGAINST INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

76.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.    By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of NIKE.

78.    Plaintiff, as a shareholder and representative of NIKE, seeks restitution from Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.    Declaring that Plaintiff may maintain this derivative action on behalf of NIKE and that Plaintiff is a proper and adequate representative of the Company;

b.    Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

c.    Directing NIKE to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not

limited to, putting forward for shareholder vote resolutions for amendments to the Company's

By-Laws or Articles of Incorporation and taking such other action as may be necessary to place

before shareholders for a vote a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines

of the Board;

       d.      Awarding to NIKE restitution from Individual Defendants, and each of them, and

ordering disgorgement of all profits, benefits and other compensation obtained by Individual

Defendants;

       e.      Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

       f.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

79.    Plaintiff demands a trial by jury.

DATED:  August 2, 2024.      MARKOWITZ HERBOLD PC

*s/ Kerry J. Shepherd*
Kerry J. Shepherd, OSB #944343
KerryShepherd@MarkowitzHerbold.com
*Attorneys for Plaintiff Patrick Ayers*

and

THE WEISER LAW FIRM, P.C.
James M. Ficaro, *Pro Hac Vice Admission* to be filed
jficaro@weiserlawfirm.com
John J. Gross, *Pro Hac Vice Admission* to be filed
jgross@weiserlawfirm.com
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677
*Attorneys for Plaintiff Patrick Ayers*

2180996.2

**Page 26 –**     **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**