# EXHIBIT E

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF WASHINGTON

| | |
|---|---|
| MARGARET MCLAUGHLIN,<br>Plaintiff,<br>v.<br>NIKE, INC.,<br>Defendant. | Case No. 26CV01362<br>**COMPLAINT**<br>(For Inspection of Books and Records Pursuant to ORS 60.774 and 60.781)<br>Filing fee: $281 ORS 21.135(1)(2)(a)<br>Not Subject to Mandatory Arbitration |

Plaintiff Margaret McLaughlin ("Plaintiff"), by and through her undersigned counsel, respectfully submits this Complaint for relief pursuant to section 60.774 ("Section 60.774") and section 60.781 ("Section 60.781") of the Oregon Revised Statutes to compel inspection of the books and records of NIKE, Inc. ("NIKE" or the "Company"). Plaintiff alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters, including the investigation of her undersigned counsel, as follows.

**NATURE OF THE ACTION**

1.

The focus of this Complaint is to compel production of NIKE's books and records pursuant to Section 60.781. On September 23, 2025, Plaintiff sent her forty-five-page inspection demand to the Company pursuant to Section 60.774 (the "Demand"). *See* Exhibit 1. The Demand complied with the requirements of Oregon law. NIKE, however, has refused to produce the documents Plaintiff is entitled to under Oregon law.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

2.

Section 60.774 grants inspection rights to shareholders, including the examination of board of directors' minutes and accounting records. Although the available Oregon precedent on this topic is sparse, the Oregon Supreme Court has ruled that a shareholder's right to inspect records should be given a "broad and liberal construction."[1] Under Section 60.781, if a corporation does not allow a shareholder who complies with Section 60.774 to inspect and copy any records required by that subsection to be available for inspection, the circuit court of the county where the corporation's principal office is located, or, if the principal office is not in this state, where its registered office is or was last located, may summarily order inspection and copying of the records demanded at the corporation's expense upon application of the shareholder.

3.

Plaintiff explained in the Demand that she was concerned that the Company's fiduciaries: (a) issued materially false and misleading statements that artificially inflated NIKE's stock; (b) sold over $263.1 million worth of their Company stock while the stock price was inflated; and (c) caused the Company to repurchase over $15 billion worth of its own stock at artificially inflated prices. Plaintiff was also investigating whether certain fiduciaries' actions caused the Company to be the subject of a federal securities class action lawsuit in the U.S. District Court of Oregon, *In re NIKE, Inc. Securities Litigation*, Case No. 3:24-cv-00974 (the "Securities Class Action"), which includes nineteen confidential witnesses.

4.

The Demand centered around NIKE's direct-to-consumer ("DTC") business model and the "Consumer Direct Acceleration" ("CDA") strategy. NIKE sells products through both wholesale and DTC channels. Most of NIKE's wholesale channel sales are to retailers that sell NIKE products along with products from other brands. Under the DTC model, a consumer can

[1] *Meyer v. Ford Indus., Inc.*, 272 Or. 531, 541, 538 P.2d 353, 358 (1975).



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

walk into a NIKE store or log onto NIKE's website or mobile applications ("apps") and buy NIKE's products without the need to go through a third-party retailer.

5.

The CDA strategy envisioned "three areas of strategic acceleration," which included: (i) increasing NIKE's focus on digitally-led DTC operations; (ii) increasing NIKE's technological capabilities to enable those DTC operations; and (iii) engaging in a massive corporate restructuring to streamline and reorganize the Company's business around what it called "consumer constructs," meaning demographic categories—specifically, "Men's," "Women's," and "Kids'." This was a shift from NIKE's prior approach of orienting its business around sport-based categories (e.g., running and basketball, among other sports).

6.

The Company's fiduciaries repeatedly conveyed that NIKE had successfully built out or maintained key components of the CDA strategy and, as a result, that the CDA strategy was succeeding at propelling long-term, sustainable growth. Unbeknownst to investors, however, each key component of the CDA strategy was plagued by persistent, severe problems. The existence of such problems is evidenced by the Company's own public admissions as the truth regarding the CDA strategy's failures gradually emerged. The nineteen confidential witnesses, which are former NIKE employees, in the Securities Class Action, corroborate the existence of the CDA's issues, which artificially inflated the Company's stock price.

7.

As the truth gradually emerged through several partial corrective disclosures, NIKE's stock price declined 40.2%, falling from $137.49 to $82.10 per share. The $55.39 per share drop equated to a market capitalization loss of over $77.5 billion.

8.

As discussed in the Demand, NIKE's fiduciaries caused the Company to spend over $15.9 billion to repurchase 143,031,744 shares of its common stock at inflated prices when



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

knowing the undisclosed truth about the Company's business. Additionally, while the Company's stock price traded at these extreme highs, certain fiduciaries sold over $263.1 million worth of their personally held stock when knowing the truth about NIKE's revenue and growth prospects. Accordingly, Plaintiff has more than sufficient reason to support her investigation under Oregon law.

9.

To complete her investigation, Plaintiff, while reserving all rights, is seeking relevant minutes of NIKE's Board of Directors ("Board") and accounting records of the corporation. This includes Board materials from August 1, 2020 through the present concerning NIKE's stock repurchases, revenues, supply chains, workforce reductions, product pipeline, the CDA strategy, market share, agreements made to pursue the CDA strategy, suspiciously timed executive departures, insider sales, and the review or approval of several statements that were materially false and misleading. Additionally, Plaintiff requires the 10b5-1 trading plans of certain insider sellers to determine if sales were made pursuant to the trading plans or if the trading plans were amended after insiders learned of material nonpublic information.

10.

The above-listed categories of documents are included in Demand Nos. 1 and 3. Each category is directly connected to Plaintiff's purpose. Plaintiff needs Board records concerning revenues, supply chains, workforce reductions, the CDA strategy, market share, and agreements made to pursue the CDA strategy to determine if the Board knew that the CDA strategy was failing. If the Board knew that the strategy was failing, then the Board approved statements which artificially inflated the Company's stock price and Plaintiff is investigating who approved those statements. Since the Company's stock price was artificially inflated, Plaintiff needs to assess what damage has been done to the Company and investigate who is responsible for the repurchases. Plaintiff also needs to investigate which insiders knew of material nonpublic information concerning the CDA's failure and to what extent they used that information to



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

benefit themselves—the insider sales and 10b5-1 trading plans. Lastly, Plaintiff is investigating the suspiciously timed departure of several executives—former Chief Digital Information Officer Ratnakar Lavu ("Lavu"), former Managing Director, Strategic Business Ventures and former Chief Operating Officer Andrew Campion ("Campion"), and former President and Chief Executive Officer ("CEO") John J. Donahoe II ("Donahoe"). These individuals left the Company around the same time the public learned the truth regarding the CDA strategy's failures and the stock price plummeted. Plaintiff needs to investigate the circumstances of the executive departures to determine if the executives are responsible for the wrongdoing described in the Demand.

11.

Despite the plethora of evidence provided in the Demand, NIKE has refused to provide relevant Board materials, only offering a self-selected set of documents with a shorter time period than what was requested in the Demand. Even after being provided with Oregon Supreme Court law stating that Section 60.774 must be interpreted broadly, NIKE still refuses to produce documents that Plaintiff is entitled to, necessitating this action. Plaintiff cannot complete her investigation without being able to inspect relevant Board materials.

## **JURISDICTION AND VENUE**

12.

This court has jurisdiction over NIKE because the Company is a corporation that conducts business in and maintains operations in Oregon which renders the exercise of jurisdiction by the Oregon courts permissible under traditional notions of fair play and substantial justice.

13.

Venue is proper in this court because NIKE conducts regular, sustained business activity in this county. Further, NIKE's principal office is in this county. *See* ORS 14.080(2).

/ / /



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

## THE PARTIES

14.

Plaintiff is a beneficial owner of NIKE common stock and has continuously held NIKE stock since May 2018.

15.

Defendant NIKE is an Oregon corporation with principal executive offices located at One Bowerman Drive, Beaverton, Oregon and NIKE's registered agent is in Portland, Oregon. The Company designs, develops, markets, and sells athletic footwear, apparel, equipment, accessories, and services. NIKE sells products through NIKE Direct operations, which are comprised of NIKE-owned retail stores and digital platform sales, as well as to wholesale accounts including a global mix of independent distributors, licensees, and sales representatives. The Company currently offers products under the NIKE, Jordan, and Converse brands. As of May 31, 2025, defendant NIKE had approximately 77,800 employees worldwide.

## THE DEMAND'S PURPOSE IS DESCRIBED WITH REASONABLE PARTICULARITY

### The Demand Explains How the Company's Stock Price Was Artificially Inflated

16.

NIKE sells products through both wholesale and DTC channels. DTC channels include both physical and digital stores. For physical stores, NIKE runs a fleet of brick-and-mortar NIKE-branded stores (e.g., "NIKE Live" stores) that sell only NIKE products to consumers. DTC stores like these that only sell NIKE are commonly referred to as "mono-brand" stores. In addition to its physical stores, NIKE operates a website (NIKE.com) and apps such as the NIKE app and the SNKRS app, which allow customers to purchase NIKE products online.

17.

NIKE has traditionally reported its revenue through three segments: Sales through NIKE Direct ("NIKE Direct," which consists of sales through NIKE's various DTC channels), Sales to



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

Wholesale Customers ("Wholesale," which consists of sales to NIKE's wholesale partners), and Global Brand Divisions ("Global Brand," which consists of NIKE Brand licensing and other miscellaneous revenues that are not part of a geographic operating segment). Sales made through NIKE's Wholesale and DTC channels are core to NIKE's operations because revenues from those two channels constitute approximately 95% of NIKE's total revenue.

18.

Historically, NIKE has sold a majority of its merchandise through its wholesale partners. However, over the past decade, NIKE made an effort to increase the portion of its revenue derived from DTC channels. As part of this plan, in 2017, NIKE announced its "Consumer Direct Offense" strategy, which sought to "drive growth" by increasing investments in the Company's DTC channels, while similarly increasing the pace of NIKE's innovative product pipeline. In 2020, NIKE's strategic pivot reached a key inflection point with the appointment of Donahoe as NIKE's CEO and the announcement of the "next phase" of NIKE's DTC-focused strategy—CDA. The CDA strategy included: (i) increasing NIKE's focus on digitally-led DTC operations; (ii) increasing NIKE's technological capabilities to enable those DTC operations; and (iii) engaging in a massive corporate restructuring to streamline and reorganize the Company's business—shifting from sport-based categories to demographic categories.

19.

Unknown to the public, NIKE's CDA strategy was failing for several reasons. First, the CDA strategy's success hinged on NIKE developing an effective DTC supply chain because, without one, NIKE could not successfully distribute its merchandise to meet consumer demand. However, NIKE failed to develop an effective DTC supply chain.

20.

Second, the CDA strategy required that NIKE build out and unify its DTC technological infrastructure, capabilities, and organization. Unfortunately, NIKE failed to successfully build out the DTC technological capabilities and organization that the Company needed. Specifically,



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

NIKE's DTC technology could not reliably perform critical functions like effectively personalize marketing to consumers on the NIKE website and its various mobile apps.

21.

Third, the CDA strategy required NIKE to execute a substantial corporate reorganization, including by pivoting away from categorizing NIKE's product lines based on sports, to consumer constructs based on gender and age (e.g., "Men's," "Women's," and "Kids'"). However, NIKE later admitted the failure of this restructuring—entirely reversing course to recreate the prior sport-based categorization of products that existed before the CDA strategy launched. For example, in NIKE's March 21, 2024 earnings call, the Company admitted that NIKE had reverted to using the sport-based categorization "[s]tarting last June" (i.e., June 2023).

22.

Fourth, maintaining an innovative product pipeline to meet consumer demand was another requirement for the CDA strategy to work. However, NIKE's innovation stagnated after it lost critical talent due to personnel cuts made pursuant to the CDA strategy. Thus, NIKE cut its innovation and instead flooded the market with key classic products, like the Air Jordan sneakers. During the March 21, 2024 earnings call, NIKE's fiduciaries admitted that through the CDA strategy, the Company had failed to "drive a continuous flow of new product innovation" and that NIKE had "been missing some product newness at scale in our portfolio over the last several seasons."

23.

Fifth, the CDA strategy required NIKE to maintain its brand distinction and competitive separation. However, NIKE's brand strength and competitive position significantly declined. On NIKE's June 27, 2024 earnings call, Matthew Friend ("Friend")[2] admitted that NIKE needed

[2] Friend joined NIKE in 2009. He has served as Executive Vice President and Chief Financial Officer ("CFO") of NIKE since April 2020. Friend previously served in various roles at NIKE, including as Vice President of Investor Relations and CFO of the NIKE Brand.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

to now get "focused on taking back market share," which NIKE had lost to competitors, like Hoka and On who were more innovative than the Company.[3]

24.

Sixth, for the CDA to succeed, NIKE's channel mix between Wholesale and DTC sales needed to match consumer preferences. In other words, even if NIKE were able to develop the capabilities to sell a far larger number of its products through DTC channels, those capabilities would be useless if consumers preferred to purchase NIKE products from non-DTC channels (i.e., multi-brand retailers). Unfortunately, Company executives admitted that they had failed to respond to customer demand for multi-brand shopping. During NIKE's March 21, 2024 earnings call, Friend admitted that the Company had knowingly disregarded consumer demand for multi-brand shopping so that the Company could hit performance metrics.

25.

Seventh, NIKE's fiduciaries repeatedly touted to investors that the CDA strategy was succeeding at propelling the growth that was promised to investors. In truth, the CDA strategy was failing to drive sustainable growth for NIKE, as missed revenue targets demonstrated.

**The Demand Includes a Significant Amount of Evidence to Support Its Purpose**

26.

The Demand supported its purpose with the following: (i) thirty-one improper statements; (ii) NIKE's public statements admitting that issues with the CDA strategy existed; (iii) calculations of market capitalization losses once the Company disclosed the CDA's issues; (iv) the Securities Class Action, including the nineteen former NIKE employees that corroborated the CDA's issues; (v) suspicious insider sales by Company insiders; (vi) calculations of billions of dollars of repurchases shares made at artificially inflated prices; and (vii) suspicious departures of senior NIKE executives.

---

[3] Hoka and On, NIKE's competitors, are both popular modern running and athletic shoe brands known for their innovative, maximalist cushioning, which provides comfort and support.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

27.

To start, the Demand includes thirty-four pages of improper statements made by the Company and its executives from March 18, 2021 through October 1, 2024. This included statements by Campion, Donahoe, Friend, Heidi L. O'Neill ("O'Neill"),[4] and Mark G. Parker ("Parker").[5] The statements included detailed explanations of how each statement was misleading. Further, the Demand explained how each revelation of the truth negatively impacted NIKE's stock price and why, with news articles and analyst opinions. The Demand meticulously details each loss in market capitalization when the truth emerged through a series of disclosures on December 21, 2023; March 21, 2024; June 27, 2024; and October 1, 2024. NIKE's stock price declined 40.2%, falling from $137.49 to $82.10 per share. The $55.39 per share drop equated to a market capitalization loss of over $77.5 billion.

28.

Next, Plaintiff listed out and explained why certain sales by Company insiders were suspicious.[6] For instance, the size of the sales was suspicious. Campion, Friend, Matheson, O'Neill, and Parker sold $5.5 million, $14.3 million, $26.6 million, $7.9 million, and $208.6 million worth of their personally held NIKE stock, respectively, for a total over $263 million. The Demand pointed out that sales from March 19, 2021 through October 3, 2024 (the "Sales

[4] O'Neill joined NIKE in 1998. She has served as President, Consumer, Product & Brand of NIKE from May 2023 to May 2025. In that role, O'Neill was responsible for the integration of the global Men's, Women's & Kids' consumer teams, the entire global product engine and Global Brand marketing and sports marketing. From April 2020 to May 2023, she served as President of NIKE Consumer and Marketplace, responsible for leading NIKE Brand's four geographic operating regions along with leading NIKE's Global Sales and NIKE Direct organizations. Prior to that position, O'Neill served as President, DTC from 2016 to 2020.

[5] Parker has served as Executive Chairman of NIKE's Board at all relevant times. He was NIKE's CEO from 2006 to January 13, 2020, and Chairman, President, and CEO from 2016 to January 13, 2020. Parker has been employed by NIKE since 1979 with primary responsibilities in product research, design, and development, marketing, and brand management.

[6] The "Insider Sellers" are Campion, Friend, O'Neill, Parker, and Monique Matheson ("Matheson")—former Executive Vice President, Chief Human Resources Officer.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

Period"), represented 46.63%, 57.07%, 64.45%, 23.88%, and 57.37% of Campion's, Friend's, Matheson's, O'Neill's, and Parker's total stock, respectively.

29.

The timing of the sales was also suspicious. The truth was disclosed through a series of disclosures on December 21, 2023; March 21, 2024; June 27, 2024; and October 1, 2024. The Demand listed out all the stock sales by the Insider Sellers during the Sales Period with specific dates, amount of shares sold, proceeds gained, and share price at the time of the sale. Using the chart in the Demand, Matheson sold almost $1.2 million worth of her stock less than two weeks before the first disclosure on December 21, 2023. Just several weeks before the March 21, 2024 disclosure, Parker sold over $17 million worth of his NIKE stock. Friend dumped almost $900 thousand worth of NIKE stock a few weeks before the June 27, 2024 disclosure.

30.

Additionally, the Demand calculated out the repurchases made by NIKE during the Sales Period. It was a staggering 143,031,744 shares for a total of $15.9 billion. Given that the price of NIKE's common stock on October 3, 2024, was $82.10 per share, the Company overpaid approximately $4,245,577,731 for the repurchased shares.

31.

Further, the Demand pointed out the suspicious departures of Donahoe, Campion, and Lavu, senior executives responsible for the CDA strategy or its key components (like the DTC supply chain and technological capabilities). On February 20, 2023, Business Insider reported that Lavu had "resigned, effective immediately, according to an email sent to [NIKE] employees." Lavu was responsible for overseeing the DTC technological capabilities and organization NIKE needed for the CDA strategy to succeed. On January 5, 2024, just over two weeks after the first disclosure on December 21, 2023, NIKE abruptly announced that Campion would exit NIKE effective April 5, 2024. On September 19, 2024, after three consecutive quarters of disappointing financial results and related disclosures about the failures of the CDA



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

strategy, and only two weeks before the final disclosure of the truth on October 1, 2024, the Company withdrew its financial guidance for the year, NIKE's Board announced the abrupt departure of Donahoe.

## THE COMPANY REFUSES TO PRODUCE RELEVANT INSPECTION MATERIALS

32.

On September 23, 2025, Plaintiff sent the Demand pursuant to Section 60.774 concerning the Company's operations. The Demand noted that Plaintiff is a shareholder of NIKE stock and specifically demanded to inspect:

1. The Board books and records, including any minutes, resolutions, reports, presentations, or memoranda made, reviewed by, or provided to the Board, concerning:

a. the repurchase of NIKE stock;

b. revenue and gross margins, specifically through DTC and wholesale channels;

c. the DTC segment and the CDA strategy;

d. supply chains;

e. workforce reductions, driven by, related to, or affecting the CDA strategy;

f. NIKE's product pipeline;

g. market share and competitive standing;

h. agreements with Adobe to build out technological capabilities;

i. Lavu's, Campion's, and Donahoe's departures from the Company;

j. insider sales by the Insider Sellers;

k. the review, approval, or editing of the July 2021 10-K; October 5, 2021 10-Q; January 6, 2022 Form 10-Q; April 5, 2022 Form 10-Q; July 2022 10-K; October 6, 2022 Form 10-Q; January 5, 2023 Form 10-Q; April 6, 2023 Form 10-Q; July 2023 10-K; and July 2024 10-K;

l. the review, approval, or editing of the March 18, 2021 press release; June 24, 2021 press release; September 23, 2021 Form 8-K; November 18, 2021 press release;



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

December 20, 2021 press release; March 21, 2022 Form 8-K; June 27, 2022 press release; September 29, 2022 press release; March 21, 2023 press release; May 24, 2023 press release; June 29, 2023 press release; December 21, 2023 press release; March 21, 2024 press release; June 27, 2024 press release; and October 1, 2024 press release; and

m. the review, approval, or editing of statements, talking points, or prepared comments made at the March 18, 2021 Earnings Call; April 26, 2021 University of California, Berkeley's Hass School of Business video; June 24, 2021 Earnings Call; September 23, 2021 Earnings Call; October 6, 2021 Annual Shareholder Meeting; December 20, 2021 Earnings Call; March 21, 2022 Earnings Call; March 30, 2022 Facebook post by Adobe Experience Cloud; May 16, 2022 WWD Articles; June 27, 2022 Earnings Call; September 9, 2022 Annual Shareholder Meeting; September 29, 2022 Earnings Call; December 20, 2022 Earnings Call; March 21, 2023 Earnings Call; June 29, 2023 Earnings Call; September 12, 2023 Annual Shareholder Meeting; September 28, 2023 Earnings Call; December 21, 2023 Earnings Call; March 21, 2024 Earnings Call; June 27, 2024 Earnings Call; and October 1, 2024 Earnings Call.

2. The communications to or from the Board concerning the topics in Demand No. 1.

3. The 10b5-1 trading plans for the Insider Sellers, operative between the Sales Period, including, without limitation, any modification or amendments to these plans.

4. Documents sufficient to identify the Company's internal controls, policies, and procedures in place to ensure NIKE's financial standing are adequately and timely reported to management and the Board.

5. Documents and communications sufficient to determine director independence and identify any potential conflicts of interest among Board members, including:

a. director questionnaires;

b. the selection process for new Board members;

c. the selection process for committee members;

d. related-party transactions; and

e. prior existing relationships among Board members.

6. The documents provided in response to any other demands investigating the same or similar matters identified in this demand.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

33.

The books and records sought were narrowly tailored to serve Plaintiff's purpose for serving the Demand, i.e., to investigate possible breaches of fiduciary duty, corporate waste, and unjust enrichment. This proper purpose is reasonably related to Plaintiff's interest as a shareholder of NIKE and not contrary to the Company's best interests. The Demand enumerated the following legitimate and proper purpose for the inspection of the books, records, and documents, stating:

> Ms. McLaughlin brings this demand for a proper purpose as required under Oregon law. Our client's proper purpose is to investigate potential wrongdoing by fiduciaries of the Company, including the Board of Directors (the "Board") of NIKE. Specifically, whether the Company's fiduciaries: (i) made materially false and misleading statements concerning NIKE's direct to consumer ("DTC") model; (ii) sold NIKE stock based on material nonpublic information; and (iii) repurchased NIKE's stock at artificially inflated prices. Once our client has reviewed the requested information she will take appropriate action.

34.

The Company responded to the Demand on September 29, 2025, asking for more time to respond, which the Plaintiff granted. On October 7, 2025, the Company formally responded to the Demand (the "Response").[7] The one-page Response claimed that the Demand did not comply with Oregon law, simply cited to Section 60.774, and did not include any accompanying case law. Despite this, the Company offered to engage further with the Plaintiff regarding a production and entry into a mutually acceptable confidentiality agreement.

35.

On October 12, 2025, Plaintiff responded and asked for times to discuss the Demand. On October 14, 2025, the parties met and discussed a potential scope of production that focused on Board minutes and materials. Plaintiff explained during the call that Oregon applies its books and records laws liberally and would require a scope of production sufficient to meet her needs to investigate the wrongdoing.

[7] The Response is attached hereto as Exhibit 2.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

36.

On October 17, 2025, Plaintiff reached out to the Company asking for the scope of production discussed and a proposed confidentiality agreement. On October 20, 2025, the Company responded by stating it was willing to produce "excerpts" of Board "minutes" covering certain topics from March 19, 2021 through December 12, 2024. This included: (i) the allegations in the Securities Class Action Complaint; (ii) the Company's public disclosures at issue in the Securities Class Action Complaint; (iii) oversight of NIKE Direct, DTC initiatives, or other digital marketing initiatives; (iv) oversight of the Company's public disclosures concerning NIKE Direct, DTC initiatives, or other digital marketing initiatives; (v) the severance of NIKE relationships with wholesalers, brick-and-mortar retailers, and other such end-sellers; and (vi) the selling of Company shares by Company insiders and any policies or agreements related thereto.

37.

This self-selected set of documents is not sufficient for Plaintiff to complete her investigation and does not adhere to Section 60.774 for several reasons. First, the time period offered merely mimics the class period in the Securities Class Action. The Demand explains that the CDA strategy began in 2020. Second, the scope of production ignores accounting records—repurchases, revenue and gross margins, supply chains, workforce reductions, product pipelines, market share, and agreements purportedly made under the CDA strategy. Third, the scope of production vaguely describes insider sales and "agreements related thereto" without being clear that the scope includes 10b5-1 trading plans and any amendments to the plans. It is relevant to know if an insider learned of material nonpublic information and then amended a trading plan. Fourth, the proposed scope of production does not include presentations made to the Board during relevant meetings which are part of "accounting records" under Section 60.774.



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

38.

On October 31, 2025, Plaintiff responded and pointed out that the scope only mentions minutes and not Board materials. On November 4, 2025, the Company stated that it would not be producing Board materials "because the inspection statute expressly limits production to 'excerpts of minutes.'" That same day, Plaintiff pointed out that, as explained during a previous call, the Company's interpretation of Section 60.774 is incorrect. First, the statute also includes accounting records. Second, the Oregon Supreme Court has explained that accounting records should be given a "broad and liberal construction so as to extend to all records, contracts, papers and correspondence to which the common-law right of inspection of a stockholder may properly apply." *Meyer*, 272 Or. at 541, 538 P.2d at 358. Plaintiff informed the Company that its unduly narrow interpretation of the Oregon statute was an effective rejection of the Demand and that Plaintiff would proceed accordingly. To date, the Company has not responded to Plaintiff's November 4, 2025, communication.

39.

It is apparent that without Court intervention under Section 60.781, NIKE will continue to erect legally unsupported hurdles and will not comply with Plaintiff's request under Section 60.774. Indeed, the Company has ignored the Oregon case law provided by Plaintiff during communications. Plaintiff has no other option than to file this action to compel the production of these documents.

## CAUSE OF ACTION

**(Demand for Inspection Pursuant to Section 60.781)**

40.

Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

41.

Plaintiff made a written demand upon the Company for the inspection of the books,



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

records, and documents identified in the Demand.

42.

Plaintiff has complied fully with all requirements under Section 60.774 respecting the form and manner of making a demand for inspection of NIKE's books and records.

43.

Plaintiff's demand for inspection is for a proper purpose and made in good faith. The books and records listed in Demand Nos. 1-6, are necessary, essential, and directly related to the satisfaction of that proper purpose.

44.

Plaintiff's purpose is described with reasonable particularity through the plethora of evidence used in the Demand. There is sufficient evidence for the Court to conclude there was wrongdoing at NIKE in connection with the Company's failed CDA strategy.

45.

NIKE has not provided Plaintiff with access, or agreed to provide her with access, to the books and records related to Demand Nos. 1-6, except for excerpts of minutes. Under these circumstances, Plaintiff cannot complete her investigation.

46.

By reason of the foregoing and pursuant to Section 60.781, Plaintiff is entitled to an order permitting her to inspect and make copies of the books and records concerning the Company's CDA strategy, repurchases of stock, Insider Sellers' sales, executive departures, improper statements, and accounting information, as described in the Demand, including all books and listed in Demand Nos. 1-6.

47.

By reason of the foregoing and pursuant to Section 60.781, Plaintiff is entitled to reimbursement of expenses for bringing this action because NIKE's position in refusing to comply with its legal obligations under Section 60.774 is frivolous and advanced without



KILMER, VOORHEES & LAURICK, P.C.
A PROFESSIONAL CORPORATION
2701 NW VAUGHN STREET, SUITE 780
PORTLAND, OREGON 97210
(503) 224-0055 · FAX (503) 222-5290

reasonable cause.

48.

Plaintiff has no adequate remedy at law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment in her favor and prays for relief as follows:

A. That the Court summarily order NIKE to produce to Plaintiff and her designees the books and records identified in Plaintiff's Demand;

B. That the Court award Plaintiff her costs and expenses, including reasonable attorneys' fees, in connection with this Section 60.781 action; and

C. Granting Plaintiff any and all further relief as the Court deems just and proper.

DATED this 12th day of January, 2026.

KILMER, VOORHEES & LAURICK, P.C.

*/s/ Peter J. Viteznik*

Peter J. Viteznik, OSB No. 944540
pviteznik@kilmerlaw.com

Brian J. Robbins *(pro hac vice forthcoming)*
Stephen J. Oddo *(pro hac vice forthcoming)*
**ROBBINS LLP**
5060 Shoreham Place, Suite 300
San Diego, CA 92122
brobbins@robbinsllp.com
soddo@robbinsllp.com

*Counsel for Plaintiff Margaret McLaughlin*

M:\11640\0001\Pleadings\2026-0112 Complaint.docx

ROBBINS LLP

5060 Shoreham Pl., Ste. 300
San Diego, CA 92122
619.525.3990 *phone*
619.525.3991 *fax*
www.robbinsllp.com

September 23, 2025

**VIA FEDEX OVERNIGHT**

Elliott Hill, President & Chief Executive Officer
NIKE, INC.
One Bowerman Drive
Beaverton, OR 97005

Registered Agent
UNITED AGENT GROUP INC.
5708 SE 136th Ave Ste 2
Portland, OR 97236

**Re: NIKE, Inc. Stockholder Inspection Demand**

Dear Mr. Hill:

We represent Margaret McLaughlin, a stockholder of NIKE, Inc. ("NIKE" or the "Company"). We write on our client's behalf to demand that the Company permit Ms. McLaughlin, through her legal counsel, to inspect certain books and records of Nike, pursuant to section 60.774 of the Oregon Revise Statutes ("Section 60.774"). Pursuant to Section 60.774, our client has authorized Robbins LLP to inspect the Company's books and records on her behalf.

Ms. McLaughlin brings this demand for a proper purpose as required under Oregon law. Our client's proper purpose is to investigate potential wrongdoing by fiduciaries of the Company, including the Board of Directors (the "Board") of NIKE. Specifically, whether the Company's fiduciaries: (i) made materially false and misleading statements concerning NIKE's direct to consumer ("DTC") model; (ii) sold NIKE stock based on material nonpublic information; and (iii) repurchased NIKE's stock at artificially inflated prices. Once our client has reviewed the requested information she will take appropriate action.

**BASIS FOR INSPECTION**

**Overview**

As you are aware, NIKE sells products through both wholesale and DTC channels. Most of NIKE's wholesale channel sales are to retailers that sell NIKE products along with products from other brands. Under the DTC model, a consumer can walk into a NIKE store or log onto NIKE's website or mobile applications ("apps") and buy NIKE's sneakers or other products without the need to go through a third-party retailer, like Foot Locker.

DTC channels include both physical and online stores. As to the former, NIKE runs a fleet of brick-and-mortar NIKE-branded stores (e.g., "NIKE Live" stores) that sell only NIKE products to consumers. DTC stores like these that sell only one brand are commonly referred to as "mono-brand" (or "monobrand") stores. In addition to its physical mono-brand stores, NIKE also operates

GCC/IBT 840-M

a website (Nike.com) and apps such as the NIKE App and the SNKRS App, which allow customers to purchase NIKE products on the internet.

Within the NIKE Brand, NIKE has historically, and at all relevant times, reported its revenue through three segments: Sales through NIKE Direct ("NIKE Direct," which consists of Sales through NIKE's various DTC channels including NIKE's physical stores and NIKE Brand Digital), Sales to Wholesale Customers ("Wholesale," which consists of sales to NIKE's wholesale partners), and Global Brand Divisions ("Global Brand," which consists of NIKE Brand licensing and other miscellaneous revenues that are not part of a geographic operating segment). Nearly all of NIKE Brand revenue is generated in and reported under NIKE Direct and Wholesale. Sales made through NIKE's Wholesale and DTC channels were core to NIKE's operations, as revenues from those two channels constituted approximately 95% of NIKE's total revenue.

Historically, NIKE has sold a significant majority of its merchandise through its wholesale partners. However, over the past decade, NIKE made a concerted effort to increase the portion of its revenue derived from DTC channels as opposed to wholesale channels. As part of this effort, in 2017, NIKE announced its "Consumer Direct Offense" ("CDO") strategy, which sought to "drive growth" by increasing investments in the Company's DTC channels, while similarly increasing the pace of NIKE's innovative product pipeline. In 2020, NIKE's strategic pivot reached a key inflection point with the appointment of John Donahoe ("Donahoe") as NIKE's Chief Executive Officer ("CEO") and the announcement of the "next phase" of NIKE's DTC-focused strategy—which NIKE called "Consumer Direct Acceleration" ("CDA").

The CDA strategy envisioned "three areas of strategic acceleration," which included: (i) increasing NIKE's focus on digitally-led DTC operations; (ii) increasing NIKE's technological capabilities to enable those DTC operations; and (iii) engaging in a massive corporate restructuring to streamline and reorganize the Company's business around what it called "consumer constructs," meaning demographic categories—specifically, "Men's," "Women's," and "Kids'." This was a shift from NIKE's prior approach of orienting its business around sport-based categories (e.g., running and basketball, among other sports).

The Company's fiduciaries repeatedly conveyed that NIKE had successfully built out or maintained key components of the CDA strategy and, as a result, that the CDA strategy was succeeding at propelling long-term, sustainable growth. Unbeknownst to investors, however, each key component of the CDA strategy was plagued by persistent, severe problems. The existence of such problems is evidenced by the Company's own public admissions as the truth regarding the CDA strategy's failures gradually emerged.

First, the CDA strategy's success hinged on NIKE developing an effective DTC supply chain because, without one, NIKE could not successfully distribute its merchandise to meet consumer demand. However, NIKE failed to develop an effective DTC supply chain, which impeded the success of the CDA strategy.

Second, the CDA strategy required that NIKE build out and unify its DTC technological infrastructure, capabilities, and organization. Unfortunately, NIKE failed to successfully build out

the DTC technological capabilities and organization that the Company needed for the CDA strategy to succeed. In particular, NIKE's DTC technology was antiquated and could not reliably perform critical functions like effectively personalize marketing to consumers on the NIKE website and its various mobile apps. NIKE partnered with Adobe in 2021, in an expensive $400-plus million deal that Donahoe personally approved, to build out these technological capabilities, which were intended to generate $1.5 billion or more in revenue. But, internally, the Adobe partnership was widely recognized as a failure from the start, as Adobe failed to deliver these capabilities, making limited progress during the next three years and ultimately generating zero revenue for NIKE.

Third, the CDA strategy required NIKE to execute a substantial corporate reorganization, including by pivoting away from categorizing NIKE's product lines based on sports (e.g., running, basketball, tennis, etc.) to consumer constructs based on gender and age (e.g., "Men's," "Women's," and "Kids'"). However, NIKE later admitted the failure of this restructuring—entirely reversing course to recreate the prior sport-based categorization of products that existed before the CDA strategy launched. For instance, in NIKE's March 21, 2024, earnings call, the Company admitted that NIKE had reverted to using the sport-based categorization "[s]tarting last June" (i.e., June 2023).

Fourth, maintaining an innovative product pipeline to meet consumer demand was a foundational requirement of the CDA strategy. In truth, NIKE's innovation stagnated after it lost critical talent due to personnel cuts made pursuant to the CDA strategy. Thus, NIKE cut its innovation, reduced its product pipeline, and instead flooded the market with key classic products, like the Air Jordan sneakers, to temporarily boost sales. During NIKE's March 21, 2024 earnings call, the Company's fiduciaries admitted that through the CDA strategy, NIKE had failed to "drive a continuous flow of new product innovation" and that NIKE had "been missing some product newness at scale in our portfolio over the last several seasons."

Fifth, the CDA strategy required NIKE to maintain its brand distinction and competitive separation. However, NIKE's brand strength and competitive position significantly declined. During NIKE's March 21, 2024, earnings call, Donahoe stated that NIKE's "brand marketing must become bolder and more distinctive[,]" and Matthew Friend ("Friend")[1] admitted on NIKE's June 27, 2024, earnings call that NIKE needed to now get "focused on taking back market share[,]" which NIKE had lost to competitors, including more innovative DTC competitors, like HOKA and On.[2]

Sixth, for the CDA to succeed, NIKE's channel mix between Wholesale and DTC sales needed to match consumer preferences. In other words, even if NIKE were able to develop the

[1] Friend joined NIKE in 2009. He has served as Executive Vice President and Chief Financial Officer ("CFO") of NIKE since April 2020. Friend previously served in various roles at NIKE, including as Vice President of Investor Relations and CFO of the NIKE Brand.

[2] Hoka and On, NIKE's competitors, are both popular modern running and athletic shoe brands known for their innovative, maximalist cushioning, which provides comfort and support.

capabilities to sell a far larger number of its products through DTC channels, those capabilities would be useless if consumers preferred to purchase NIKE products from non-DTC channels (i.e., multi-brand retailers). However, the Company's fiduciaries admitted that they had failed to respond to customer demand for multi-brand shopping. In particular, on NIKE's March 21, 2024, earnings call, Friend admitted NIKE had knowingly disregarded consumer demand for multi-brand shopping so that the Company could hit performance metrics: "we've been more focused on trying to achieve mix of marketplace targets than we have serving consumer demand where the consumer is shopping."

Seventh, NIKE's fiduciaries repeatedly touted to investors that the CDA strategy was succeeding at propelling the growth that was promised to investors. In reality, however, the CDA strategy was failing to drive sustainable growth for NIKE, as numerous internal red flags (including missed revenue targets discussed internally) demonstrated.

As the truth gradually emerged through several partial corrective disclosures, NIKE's stock price declined 40.29%, falling from $137.49 to $82.10 per share. The $55.39 per share drop equated to a market capitalization loss of over $77.5 billion.

Instead of promptly disclosing the truth regarding NIKE's operations, NIKE continued to express confidence in the CDA strategy, keeping the Company's stock price artificially inflated. Despite knowing the truth, NIKE's fiduciaries caused the Company to spend over $15.9 billion to repurchase 143,031,744 shares of its common stock at inflated prices. Additionally, while the Company's stock price traded at these extreme highs, certain fiduciaries sold over $263.1 million worth of their personally held stock while knowing the truth about NIKE's revenue and growth prospects.

As a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit in the U.S. District Court of Oregon, *In re Nike Inc. Securities Litigation*, Case No. 3:24-cv-00974 (the "Securities Class Action"), which includes nineteen confidential witnesses. NIKE will likely be subject to more litigation going forward.

**Improper Statements**

Beginning March 18, 2021, the Company began dispersing materially false and misleading statements concerning the success of the CDA strategy. That day, NIKE issued a press release titled "NIKE, Inc. Reports Fiscal 2021 Third Quarter Results[,]" in which Donahoe stated, in reference to NIKE's CDA strategy: "NIKE continues to deeply connect with consumers all over the world driven by our strong competitive advantages.... ***Our strategy is working, as we accelerate innovation*** and create the seamless, premium marketplace of the future. I've never been more confident in our leadership and teams to operate with agility in a dynamic environment."

On March 18, 2021, during NIKE's fiscal year ("FY") 2021 third quarter earnings call ("March 18, 2021 Earnings Call"), Donahoe falsely claimed, in response to an Evercore ISI Analyst's question about NIKE's CDA strategy, that:

> The second area that plays an important role is – one part of the consumer experience was getting the right product in the right place at the right time, and so this is where our Celect acquisition has allowed us to ***fairly impressively pivot to a more direct-to-consumer supply chain***. And I again give our supply chain team enormous credit for what they've done over the last year as we've pivoted toward digital. But what that's all about is knowing what inventory have resident in local, regional warehouses so that you can get it delivered more rapidly and often through ground transportation.

During NIKE's March 18, 2021 Earnings Call, Donahoe also touted the Company's innovation and pipeline. In particular, he stated:

> As always, our brand is propelled by our ***unmatched innovation investment and pipeline***. Innovation is at our core, reflecting not just our foundational values, but the values we share with consumers. We don't just innovate for the elite athlete, we use innovation and design to solve problems for all consumers, no matter their sport or style of play. And we consistently bring fresh, new product to market supported by compelling storytelling that helps drive consumer demand.

Analysts were reassured by the misstatements concerning NIKE's innovative product pipeline. For instance, on March 18, 2021, Guggenheim Securities, LLC issued an analyst report assigning NIKE stock a "Buy" rating and highlighting that NIKE's "***new product innovation remains robust[.]***" On March 19, 2021, UBS published an analyst report assigning NIKE stock a "Buy" rating and stating that "Nike's ***investments in product innovation***, supply chain speed and digital are unlocking what is likely a multi-year period of above average growth." Other analysts were also encouraged by the misstatements regarding NIKE's innovative product pipeline. For example, in a March 19, 2021 report, Evercore ISI stated that NIKE's "***[s]trong product pipeline***[,]" was a key factor in its "***investment thesis***" underpinning its "Outperform," rating of NIKE. Analysts' positive reactions also confirm that the market was materially misled by the misstatement concerning NIKE's DTC supply chain. For instance, on March 19, 2021, UBS published an analyst report assigning NIKE stock a "Buy" rating and stating that "Nike's investments in product innovation, ***supply chain speed*** and digital ***are unlocking what is likely a multi-year period of above average growth***."

On April 26, 2021, The University of California, Berkeley's Hass School of Business posted a video on YouTube in which Friend is depicted making the following statements as part of the Haas "Dean's Speaker Series." Friend touted NIKE's strong innovation pipeline, technological capabilities, and DTC supply chain":

> [P]roduct innovation and product and storytelling is what makes NIKE special. We could have the best mobile app. We could have the best digital commerce relationship. But if we didn't have great products that consumers wanted, it wouldn't matter, right? And so, because we're not just building a platform to sell multiple products, we're building a tighter and more intentional relationship with consumers. And so, what we've done through the pandemic and even beyond— what I've been

> focused on in my role—is ensuring that ***we're investing maniacally behind product innovation***, sustainability, and then ultimately creating these digital, a digital, platform that enables us to have those one-to-one connections with consumers at scale. ***Personalization, leveraging data analytics, um, machine learning so that we can read patterns and consumer behavior, we're employing data and analytics capabilities in our supply chain, so we know how to more smartly flow our product, where to put our product, um, the net benefit of that is higher margins because we have less waste, less mark-downs, less inefficiency, and where product sits around the world***.

On June 24, 2021, NIKE issued a press release entitled: "NIKE, Inc. Reports Fiscal 2021 Fourth Quarter and Full Year Results." In the press release, Donahoe falsely claimed that NIKE was investing in innovation:

> NIKE's strong results this quarter and full fiscal year demonstrate NIKE's unique competitive advantage and deep connection with consumers all over the world.... FY21 was a pivotal year for NIKE as we brought our Consumer Direct Acceleration strategy to life across the marketplace. Fueled by our momentum, ***we continue to invest in innovation*** and our digital leadership to set the foundation for NIKE's long-term growth.

On June 24, 2021, during NIKE's FY 2021 fourth quarter ("Q4") earnings call (the "June 24, 2021 Earnings Call"), Donahoe falsely touted NIKE's strong product innovation pipeline and competitive position. In particular, he stated:

> ***[O]ur relentless pipeline of innovative product continues to create separation between us and our competition***. Our product is fueled by sharp consumer insight, supported by marketing data and analytics as we continue to invest in our digital transformation. Through our new operating model, we are bringing more precision to the art of product creation as we blend the art and science of innovation.

Analysts were encouraged by the misstatements about NIKE's innovative product pipeline. For example, on June 25, 2021, Evercore ISI published an analyst report assigning NIKE stock an "Outperform" rating, and stating that they "believe a premium multiple is warranted given the secular growth of the active / athletic sector, ***the company's long-tailed distribution shift towards digital and DTC, and the strong product pipeline***." Similarly, in a June 25, 2021 analyst report assigning NIKE stock a "Buy" rating, UBS wrote that "[w]e see relatively limited stock price downside[,]" and explained that, "with ... Nike's ***innovation pipeline full ... we see more that can go right, from a sales and margin perspective***, than wrong."

On July 20, 2021, NIKE filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2021 ("July 2021 10-K"), which was signed by Donahoe and Friend. The July 2021 10-K stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "could have a material adverse effect on our sales and profitability."

The July 2021 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing. In particular, the July 2021 10-K stated: "***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***"

The July 2021 10-K included an additional materially misleading risk disclosure. The July 2021 10-K stated that a potential "***[f]ailure to maintain our reputation, brand image and culture could negatively impact our business.***"

Further, the July 2021 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology. In particular, the July 2021 10-K stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards***.

On September 23, 2021, during NIKE's FY 2022 first quarter ("Q1") earnings call (the "September 23, 2021 Earnings Call"). During the call, Donahoe falsely affirmed the strength of NIKE's competitive position:

> Today, ***we're in a stronger position relative to our competition than we were prior to the pandemic***. Why? Because the changes happening in the market worked in our favor. Consumers' shift to digital that might have taken five years will now only take two years. That plays to NIKE's advantage. And our Consumer Direct Acceleration strategy is capitalizing on this marketplace transformation.

During the September 23, 2021 Earnings Call, Friend touted the Company's supply chain. In particular, Friend stated:

> [A] couple of quarters ago I talked about, as we were starting to see the strength in consumer connections and the acceleration of our business, that we were going to begin accelerating investment to drive our digital transformation. ***And in particular, where we were investing was against technology, creating a digital-first supply chain in the marketplace.*** And we created a multiyear investment plan against our outlook to drive that growth.

On September 23, 2021, the Company filed a Current Report on Form 8-K, which was signed by Friend. In discussing the CDA strategy in a press release attached to this Form 8-K, Friend falsely claimed the CDA strategy was fueling NIKE's growth: "NIKE is a growth company

with a market opportunity as large as it's ever been ... Our Q1 results illustrate how NIKE's Consumer Direct Acceleration strategy continues to fuel growth and transform our long-term financial model."

Analysts were encouraged by the misstatements concerning the CDA strategy's positive impact on NIKE's growth. For instance, in a September 23, 2021 analyst report, J.P. Morgan issued NIKE stock an "Overweight" rating, saying that Donahoe sees NIKE "in a stronger position 18 months from now ... accelerated by [] the CDA strategic focus of leveraging data/digital insights to drive inventory placement and reduce markdowns[.]" In a September 24, 2021 analyst report, Barclays Equity Research indicated that NIKE's stock price was "Overweight" in part due to "the acceleration of [NIKE's] direct-to-consumer strategy[.]"

Analysts also reacted positively to the misstatements concerning NIKE's digital-first supply chain. For example, on September 24, 2021, UBS published an analyst report assigning NIKE stock a "Buy" rating and stating that "***Nike's investments in ... supply chain speed and digital are unlocking what is likely a multi-year period of above average growth***." On the same date, Morgan Stanley assigned NIKE stock an "Overweight"[3] rating, adding: NIKE's "***supply chain innovation also create[s] LT [long-term] competitive advantages.***" On September 24, 2021, Deutsche Bank assigned NIKE stock a "Buy" rating and said: "we remain confident in the company's long-term earnings algorithm given the brand's ... ***enhanced digital/supply chain capabilities***[.]"

On October 5, 2021, NIKE filed its Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2021, which was signed by Friend. The Form 10-Q falsely touted NIKE's technological capabilities needed for a DTC supply chain:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with NIKE Digital and our owned stores, as well as select strategic partners who share our marketplace vision. We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation.***

On October 6, 2021, at NIKE's Annual Shareholder Meeting ("October 6, 2021 Annual Shareholder Meeting"), Donahoe falsely touted the continued success of the CDA strategy. In particular, he stated:

---

[3] As described by the Corporate Finance Institute, an "Overweight Stock" is a stock that financial analysts believe will outperform a benchmark stock, security, or index. The "overweight" recommendation signals to investors to devote a larger percentage of their portfolio to the stock.

> Our belief in innovation also extends to our digital advantage. We continue to elevate our membership proposition, which comes to life across our One NIKE Marketplace. This year, NIKE hosted our first ever globally coordinated member days, which reached over 60 million members across 25 countries, offering them first access to product, rewards for activity, and exclusives across stores and digital. And this year we've also added live streaming to the sneakers app and kept on innovating, launching sneakers live, our first product drop via live streaming.
>
> So today, we're the clear leaders in digital in our industry. Our owned digital revenue is now over 20% of our business, a mark we've hit three years ahead of plan. And looking ahead, we see even greater competitive acceleration. In fact, by fiscal [20]25, we expect our business to be 40% owned digital. This shift is having a profound transformation on our operating model. And thanks to our playbook, we are creating greater value for both consumers and shareholders. And so when our fourth quarter earnings call in June, we outlined new fiscal [20]25 financial goals. This new financial model is clear proof of the confidence we have in Nike's future. And as I look ahead to fiscal [20]22, I'm excited. ***We are clearly seeing our strategy work.*** The team at Nike is energized by our incredible potential, and I hope you're energized as well. Fueled by our competitive advantages, we will continue to drive our vision to create the future of sport. Thank you.

At the October 6, 2021 Annual Shareholder Meeting, in response to a shareholder question relayed by Mark G. Parker ("Parker")[4] about the CDA strategy ("[Y]ou're about a year into your new consumer direct acceleration strategy. How's that going?"), Donahoe assured the strategy's continued success. In particular, Donahoe stated: "As I said in my remarks, ***Nike's strategy is working*** and we're very encouraged and excited by the progress we've seen thus far. The consumer direct acceleration is transforming Nike with direct impacts that we can already see on our ability to serve consumers end-to-end with a premium and seamless experience, and on our business."

At the October 6, 2021 Annual Shareholder Meeting, Heidi L. O'Neill ("O'Neill")[5] touted NIKE's purportedly successful corporate reorganization of its consumer constructs. Specifically,

---

[4] Parker has served as Executive Chairman of NIKE's Board at all relevant times. He was NIKE's CEO from 2006 to January 13, 2020, and Chairman, President & CEO from 2016 to January 13, 2020. Parker has been employed by NIKE since 1979 with primary responsibilities in product research, design and development, marketing, and brand management.

[5] O'Neill joined NIKE in 1998. She has served as President, Consumer, Product & Brand of NIKE from May 2023 to May 2025. In that role, O'Neill was responsible for the integration of the global Men's, Women's & Kids' consumer teams, the entire global product engine and global brand marketing and sports marketing. From April 2020 to May 2023, she served as President of NIKE Consumer and Marketplace, responsible for leading NIKE Brand's four geographic operating regions along with leading NIKE's Global Sales and NIKE Direct organizations. Prior to that position, O'Neill served as President, DTC from 2016 to 2020.

in response to the same shareholder question relayed by Parker referenced above, O'Neill stated that "***[w]ith the CDA, we successfully realigned our organization to further invest against our highest growth areas.***"

At the October 6, 2021 Annual Shareholder Meeting, in response to the shareholder question relayed by Parker referenced above, regarding the CDA strategy, Friend falsely assured investors that NIKE was successfully building out its DTC technological capabilities. In particular, Friend stated:

> I just add that the consumer direct acceleration is having a profound effect also on our operating model. Our relentless focus on serving consumers is resulting in healthy, profitable growth. And the shift to a more direct model has resulted in Nike's highest EBIT margin in recent history. ***The investments we've made against our end-to-end digital transformation are making us more agile and we're building the capabilities that are required for Nike to operate a digitally led omni-channel, direct to consumer business at scale***.

At the October 6, 2021 Annual Shareholder Meeting, Parker responded to a shareholder question about the innovation pipeline. Parker falsely affirmed: "***The pace of innovation has not slowed down at all***."

At the October 6, 2021 Annual Shareholder Meeting, in response to a shareholder question as relayed by Parker about the status of NIKE's "digital ecosystem" and the role of brick-and-mortar stores, O'Neill again falsely assured that its CDA strategy was succeeding. In particular, O'Neill stated: "I'll start by reiterating what we've mentioned before. ***Our strategy is definitely working***. We're being very intentional in our plans to shape the marketplace of the future and how we intend to lead it."

At the October 6, 2021 Annual Shareholder Meeting, in response to a shareholder question relayed by Parker about NIKE's supply chain capabilities, Friend falsely assured investors regarding the purportedly "strong" supply chain. Specifically, Friend stated:

> We've also been investing to build capabilities that are transforming our operating model and Heidi mentioned a number of them in the marketplace question earlier. Like online to offline services for consumers, we're leveraging the express lane and ***we're building a digital first supply chain to meet the strong and growing digital demand that we see.***
>
> And all of these things are helping us to operate with more agility than we've ever operated before. So we're optimistic that inventory supply availability will improve as we approach fiscal year [20]23 and our vision for Nike's longterm future remains unchanged.

At the October 6, 2021 Annual Shareholder Meeting, Donahoe falsely maintained that NIKE's corporate reorganization had succeeded. In particular, he stated:

> And this was also a year where we brought to life, our new consumer direct acceleration strategy. ***As part of CDA, we successfully realigned our organization*** and began investing in our highest growth areas. Part of that investment is our consumer construct of men's women's and kids and Jordan, which aligns us against the biggest opportunities we see ahead of us. We're putting resources behind our end-to-end digital transformation across the value chain, as we unlock more growth and efficiency for the business.

Analysts were convinced by the misstatements concerning the digital ecosystem and success of the CDA strategy. For example, on October 12, 2021, Goldman Sachs published an analyst report assigning NIKE stock a "Buy" rating and stating that NIKE's "DTC initiative [] should drive higher gross margins over time" and that "***Nike has built an impressive digital ecosystem***." Goldman also stated that NIKE's "Powerful Brand Legacy Continues, ***Bolstered by Continued DTC Expansion***." Analysts also reacted positively to the misstatements concerning the strength and efficacy of NIKE's DTC supply chain. For example, on October 6, 2021, Deutsche Bank published an analyst report assigning NIKE stock a "Buy" rating and stating that Deutsche Banks "remain[s] confident in the company's long-term earnings algorithm given the brand's ... ***enhanced digital/supply chain capabilities***," among other things.

On November 18, 2021, NIKE issued a press release, entitled "NIKE, Inc. Announces 11 Percent Increase in Quarterly Dividend[.]" In the press release, Donahoe falsely assured investors the CDA strategy was continuing to fuel growth for NIKE:

> ***NIKE continues to fuel growth through our Consumer Direct Acceleration strategy***, while generating strong cash flow and increasing returns to shareholders.... This is now our 20th consecutive year of increasing dividend payouts, and reflects our strong track record and confidence in our ability to deliver sustainable, profitable, capital-efficient growth over the long-term.

On December 20, 2021, NIKE issued a press release entitled "NIKE, Inc. Reports Fiscal 2022 Second Quarter Results[.]" In the press release, Donahoe falsely claimed the CDA strategy was working and that NIKE's competitive position was strengthening:

> ***NIKE's strong results this quarter provide further proof that our strategy is working***, as we execute through a dynamic environment.... ***We are now in a much stronger competitive position today than we were 18 months ago.*** And I want to thank our roughly 75,000 global teammates for all their work to provide consumers with the compelling new product, innovation and experiences that only NIKE can deliver.

On December 20, 2021, during NIKE's FY 2022 second quarter ("Q2") earnings call (the "December 20, 2021 Earnings Call"), Donahoe falsely touted the continued success of the CDA strategy. Specifically, he stated: "As we look at Q2, the creativity and resilience of our entire NIKE, Inc. team helped deliver another strong quarter. ***The results we delivered offer continued proof that our strategy is working***, even as we execute through global macroeconomic

constraints." Later during this call, Donahoe reiterated this sentiment, falsely stating: "[T]oday, we are stronger than we were before the pandemic, and I couldn't be more excited by the opportunity ahead of us. ***Our results this quarter are evidence that our strategy is working***."

On the December 20, 2021 Earnings Call, Friend also falsely touted the success of the CDA strategy. In particular, Friend stated:

> ***Consumer Direct Acceleration is driving our business forward***[,] and it is transforming our financial model. We continue to prove that we can manage through the uncertainty and volatility in the current operating environment.… But we are doing more than just managing through…. [W]e are building NIKE for the future … with deeper consumer connections, a pipeline of product innovation to serve the needs of the modern athlete, and new operational capabilities required to serve consumers directly and digitally, at scale.

Analysts were encouraged by the claims about the continued success of the CDA strategy. For instance, in a December 21, 2021 report, Goldman Sachs Equity Research wrote that, after NIKE's earnings report, it maintained a positive "Buy" rating for NIKE, noting that while NIKE "is still in the early stages of its DTC strategy ... [w]e see continued DTC channel shift as a gross margin driver moving forward."

On January 6, 2022, the Company filed its Quarterly Report on Form 10-Q for the quarterly period ended November 30, 2021, which was signed by Friend. The Form 10-Q touted NIKE's technological capabilities needed for a DTC supply chain:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with NIKE Digital and our owned stores, as well as select strategic partners who share our marketplace vision. We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which will further accelerate our digital transformation***.

On March 21, 2022, during NIKE's FY 2022 third quarter ("Q3") earnings call ("March 21, 2022 Earnings Call"), in response to a UBS analyst's question concerning the "contours" of FY 2023, Friend falsely reassured investors that the CDA strategy was working. Specifically, Friend stated: "We're looking at fiscal '23 and believe the foundation is set for another year of strong growth. And that's because ***our Consumer Direct Acceleration strategy is working***."

On March 21, 2022, NIKE filed a Current Report on Form 8-K, which was signed by Friend. In a press release attached to this Form 8-K, Donahoe falsely touted the success of the CDA strategy. In particular, he stated:

> NIKE's strong results this quarter show that our ***Consumer Direct Acceleration strategy is working***, as we invest to achieve our growth opportunities.... Fueled by deep consumer connections, compelling product innovation and an expanding digital advantage, we have the right playbook to navigate volatility and create value through our relentless drive to serve the future of sport.

Analysts were encouraged by the claims about the purported success of the CDA strategy. For instance, on March 22, 2022, Barclays Equity Research indicated that the price of NIKE stock was "Overweight" (meaning it would likely increase in the future) in part due to "the ***acceleration of [NIKE's] direct-to-consumer strategy***." That same report stated that NIKE "is a DTC acceleration ... story."

In a March 30, 2022, Facebook post by Adobe Experience Cloud, Donahoe is featured in a video where he touted NIKE's DTC technological capabilities that Adobe purportedly helped build as part of their partnership. Specifically, Donahoe stated: "***The Adobe platform has played such an important role of delivering a more personalized experience for our consumers***."

On April 5, 2022, NIKE filed its Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2022, which was signed by Friend. The Form 10-Q falsely touted NIKE's technological capabilities needed for a DTC supply chain:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with digital and our owned stores, as well as select wholesale partners that share our marketplace vision. Over the last several years, as we have executed against the Consumer Direct Acceleration, we have grown our NIKE Direct business to be approximately 43% of total NIKE Brand revenues for the first nine months of fiscal 2022, and we have reduced the number of wholesale accounts globally. Additionally, we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation.***

On May 16, 2022, Women's Wear Daily published a series of articles about NIKE ("May 16, 2022 WWD Articles"). In one of those articles, titled "Heidi O'Neill on Creating a Seamless Digital/Retail Experience," O'Neill falsely insisted that the CDA strategy was succeeding. In particular, O'Neill stated: "We've been driving this Consumer Direct offense for over five years now. And you know, ***we can look at our results and know it's working***." In one of the May 16, 2022, WWD Articles, titled "Supply Chain Guru Andy Campion Offers a Peek Behind the

Curtain," Andrew Campion ("Campion")[6] falsely touted NIKE's purportedly effective DTC supply chain:

> On the one hand, the supply chain is more productive than ever in the amount of goods being produced — I think it was up 8 percent last year and that's not in price, that's in units. Demand is incredibly strong and ***we've got three to four times greater digital commerce distribution capability than we had two years ago***.

On June 27, 2022, NIKE issued a press release, entitled " NIKE, Inc. Reports Fiscal 2022 Fourth Quarter and Full Year Results." In the press release, Donahoe falsely touted NIKE's purported competitive advantages, including its innovation, and the CDA strategy's success:

> NIKE's results this fiscal year are a testament to the unmatched strength of our brands and our deep connection with consumers.... ***Our competitive advantages, including our pipeline of innovative product and expanding digital leadership, prove that our strategy is working*** as we create value through our relentless drive to serve the future of sport.

On June 27, 2022, during NIKE's FY 2022 Q4 earnings call ("June 27, 2022 Earnings Call"), Donahoe falsely touted the Company's purportedly strong innovation product pipeline and competitive position. In particular, he stated:

> My second point today is our ***relentless pipeline of innovative product, which continues to drive separation between us and our competition***. No other brand has our ability to resource, solve and scale in response to a consumer opportunity. In Q4, we again introduced new performance innovations to the market, including new footwear technology from both Nike Women's and the Jordan brand.

During the June 27, 2022 Earnings Call, Friend falsely claimed that the CDA strategy was working. Specifically, Friend stated:

> As we set the foundation for another year of strong growth, I'd like to provide some broader context around our strategic transformation.
>
> Two years ago, we introduced a bold new phase of our strategy: our Consumer Direct Acceleration. In the early months of the pandemic, we set our sights beyond simply navigating through short-term volatility. Instead, we outlined a clear vision to pursue even further competitive separation - by expanding our digital advantage, re-shaping the marketplace of the future, and creating deeper, more direct consumer relationships.

---

[6] Campion is NIKE's former Managing Director, Strategic Business Ventures.

> ***Today, NIKE's continued momentum shows that our strategy is working***. As we look forward, let me briefly highlight three of NIKE's foundational elements for long-term value creation: our global portfolio, our consumer-led digital transformation; and our expanding direct-to-consumer operational capabilities.

During the same earnings call, Friend falsely claimed that NIKE had developed needed DTC technological capabilities through its partnership with Adobe. In particular, Friend stated:

> We will also see a new consumer marketing offense in action in Fiscal '23. ***Through new capabilities activated in partnership with Adobe, we will unlock additional productivity and demand creation and member retention across our NIKE ecosystem***. We have started testing audience segmentation in North America, with real-time data and personalized journeys on the NIKE App, with plans for further expansion in the coming months.
>
> In Greater China, we are also accelerating our digital capabilities, building on our 40-year history.

During the June 27, 2022 Earnings Call, Friend also falsely insisted that the CDA strategy was working. Specifically, he stated:

> As we move forward, we will stay focused on what we can control, and continue managing the business for the long-term.
>
> This includes leveraging our scale and financial strength… optimizing supply and demand… and most importantly, creating value for our consumer - from the products we design, to the stories we tell, to the experiences that we deliver.
>
> ***Our Consumer Direct Acceleration is working***.

(Omissions in original.)

During the same call, Friend falsely touted the CDA strategy's success. In particular, Friend stated:

> Two years ago, we introduced a bold new phase of our strategy: our Consumer Direct Acceleration. In the early months of the pandemic, we set our sights beyond simply navigating through short-term volatility. Instead, we outlined a clear vision to pursue even further competitive separation - by expanding our digital advantage, re-shaping the marketplace of the future, and creating deeper, more direct consumer relationships.
>
> Today, ***NIKE's continued momentum shows that our strategy is working***.

Analysts were encouraged by the above claims. For instance, in a June 28, 2022, report, Telsey Advisory Group assigned NIKE stock an "Outperform" rating and wrote that it "remain[ed] encouraged by the pipeline of product innovation, healthy demand, customer connectivity through digital, and underlying gross margin improvement driven by the shift to DTC." Similarly, in a June 28, 2022, report, Evercore ISI Research assigned NIKE stock an "Outperform" rating and highlighted that it was "excited about [NIKE's] innovation pipeline in FY23, which seems to be an acceleration from the past few years." Likewise, in a June 28, 2022, report, Barclays Equity Research rated the price of NIKE stock as "Overweight" in part due to "the acceleration of [NIKE's] direct-to-consumer strategy[.]"

On July 21, 2022, NIKE filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2022 ("July 2022 10-K"), which was signed by Donahoe and Friend. The July 2022 10-K stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "could have a material adverse effect on our sales and profitability."

The July 2022 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing. The July 2022 10-K stated: "***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***" The July 2022 10-K included an additional materially misleading risk disclosure, which stated that a potential ***"[f]ailure to maintain our reputation, brand image and culture could negatively impact our business***."

Further, the July 2022 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology. Specifically, the July 2022 10-K stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards***.

On September 9, 2022, at NIKE's Annual Shareholder Meeting ("September 9, 2022 Annual Shareholder Meeting"), Donahoe responded to a shareholder question relayed by Parker, concerning the CDA strategy: "What's working and how has it evolved since the beginning?" In response, Donahoe falsely claimed the CDA was succeeding and that NIKE was maintaining its competitive separation:

> I'd just kick off by reiterating that ***the progress we're seeing on CDA tells us that Nike's strategy is working. We continue to see structural tailwinds.*** As I mentioned in my remarks ***around ... a consumer led shift toward digital*** that drives

> competence in our direction in our strategy. And our operational transformation is giving us the agility we need to serve consumers more directly as we create a digital led marketplace for the future.
>
> And over the past couple of years, as we've said repeatedly in our quarterly calls and other settings, we've accelerated our digital transformation in order to capture higher engagement with consumers and market share. And we've seen this in our fiscal 2022 results. So, ***our capabilities and efficiencies are allowing us to move at the speed of the consumer and to drive continued competitive separation in the market.***

At the September 9, 2022 Annual Shareholder Meeting, in response to a shareholder question relayed by Parker concerning innovation, Donahoe stated: "Well, Mark, as you know, innovation is deeply, deeply woven into every dimension of Nike's culture, and ***innovation continues to be our greatest competitive advantage***." At the September 9, 2022 Annual Shareholder Meeting, in response to a shareholder question relayed by Parker concerning the evolution of the CDA strategy, Friend falsely touted the CDA strategy's success: "***[F]undamentally, the consumer direct acceleration strategy's changing our financial and operating model resulting in healthy profitable growth for Nike***."

Analysts believed the claims that the CDA strategy was succeeding. For instance, in a September 11, 2022 report, UBS stated that "Nike held its annual shareholder meeting on 9/9 where it addressed multiple topics relevant to the current investor debates on the stock, such as its [CDA] strategy.... Our main takeaway from the event was Nike's strong conviction around its CDA strategy. We think this is a positive for the stock." The report explained that UBS continued to rate NIKE stock as a "Buy."

On September 29, 2022, NIKE issued a press release, entitled "NIKE, Inc. Reports Fiscal 2023 First Quarter Results." In the press release, Donahoe falsely touted NIKE's continued competitive advantages, including its strong brand and innovation pipeline, as proof that the CDA strategy was "working:"

> Our strong start to FY23 highlights the depth and breadth of NIKE's global portfolio, as we continue to manage through volatility.... ***Our competitive advantages, including the strength of our brand, deep consumer connections and pipeline of innovative product, continue to prove that our strategy is working***. We expect our unrelenting focus on better serving the consumer to continue to fuel growth and create value like only NIKE can.

On September 29, 2022, NIKE held its FY 2023 Q1 earnings call ("September 29, 2022 Earnings Call"). During the call, Donahoe falsely claimed that NIKE had measured as the "number one" brand under the "cool" brand metric it employed:

> Now, as we look at this quarter's strong results, we can see our brand momentum and global portfolio come to life. This is true across the three areas I'd like to walk

> through today: our brand that deeply connects with consumers, fueled by authenticity in sport; our culture of innovation that drives a continuous pipeline of new product; and our competitive advantage across the marketplace as one of the few brands that can connect with and serve as scale.
>
> Let's start with NIKE's strong brand and our connection to sport, which differentiates us all over the globe. ***Consumers continue to rate us their number one cool and number one favorite brand as we connect directly and deeply with consumers worldwide.***

During the September 29, 2022 Earnings Call, Donahoe also assured investors that NIKE had maintained its innovative product pipeline, which continued to separate it from its competitors. In particular, he stated:

> As we've said before, ***NIKE's relentless pipeline of innovative product continues to create separation between us and our competition***. Today, we have incredible momentum in key products and franchises across the spectrum of lifestyle and performance. What excites us even more is the energy and anticipation we're feeling for the innovative product that's next in the pipeline. We're now starting to see the product that reflects our shift two years ago to our new consumer construct of Men's, Women's, and Kids, and the impact it's had is remarkable.

During the September 29, 2022 Earnings Call, Friend again assured investors that "NIKE continues to lead as the number one cool and number one favorite brand in North America." On the September 29, 2022 Earnings Call, in response to a J.P.Morgan analyst's question regarding demand for NIKE products in North America, Donahoe assured investors of continued "strong consumer demand," specifically denying seeing any "softness." Specifically, Donahoe stated: "***We see strong consumer demand in North America currently. There's no signs of any softness***. It was relatively promotional in August, but strong, strong into the first couple of weeks of this quarter, and so, we again talk in terms of transitional and structural. On a transitional basis, as Matt said, we're going to work through the excess inventory."

On the September 29, 2022 Earnings Call, in response to a Guggenheim Securities, LLC analyst's question regarding inventory and the "supply/demand for NIKE[,]" Donahoe assured investors that NIKE had maintained an innovative product pipeline. In particular, he stated:

> We will be aggressive, as Matt said, on liquidating excess inventory, but also coming hard with our key popular franchises to bring heat and energy to them, just like we did in Q1, like the Travis Scott AJ1. That had a very strong full-price realization. ***We've got a very strong innovation pipeline*** that will still be coming hard and hot in Q2, Q3, and Q4. You saw in Q1, we had the Air Zoom Mercurial; we had the Air Max Scorpion; the NIKE Forward. ***We've got a really strong innovation pipeline***.

Analysts were reassured by the above claims. For instance, in a September 30, 2022 report, Telsey Advisory Group assigned NIKE stock an "Outperform" rating and wrote that it "remain[ed] encouraged by healthy demand, the pipeline of product innovation, customer connectivity through digital, and the potential for gross margin improvement driven by the shift to DTC[.]"

On October 6, 2022, NIKE filed its Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2022, which was signed by Friend. The Form 10-Q falsely claimed NIKE had successfully reorganized its business around gender and age-based consumer constructs, and also touted the Company's DTC supply chain capabilities:

> Additionally, ***we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids' and continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation***.

On December 20, 2022, NIKE held its FY 2023 Q2 Earnings Call ("December 20, 2022 Earnings Call"). During the call, Donahoe falsely touted "the continued success" of the CDA strategy:

> As I mentioned earlier, ***our Q2 results speak to the continued success of our strategy.*** Consumer Direct Acceleration is fueling our marketplace approach in which we directly connect with the consumer no matter where they shop. Today, our marketplace strategy is driving distinction in this current promotional environment. Our work to directly connect with consumers is founded on a simple consumer insight.

During the December 20, 2022 Earnings Call, Donahoe also touted NIKE's CDA-related "competitive advantages." In particular, he stated: ***"[O]ur results speak to how we've leveraged our competitive advantages, which include a relentless innovation pipeline, unmatched brands and deep consumer connections to build relative strength and stay ahead of competition***."

Analysts believed the claims that the CDA strategy was working. For instance, in a December 20, 2022, report, Guggenheim Securities, LLC assigned NIKE stock a "Buy" rating and wrote that "[t]he brand commands dominant market share, which we expect will grow materially as digital scales up further [and] new product innovation remains robust[.]" In a December 21, 2022, report rating NIKE stock as "Overweight," Morgan Stanley Research noted "DTC Skeptics Beware," and stated that NIKE's financial performance "gives us incremental confidence that [NIKE] may deliver the long-awaited, DTC-driven margin gains as soon as next year."

On January 5, 2023, NIKE filed its Quarterly Report on Form 10-Q for the quarterly period ended November 30, 2022, which was signed by Friend. The Form 10-Q falsely claimed NIKE had successfully reorganized its business around gender-and-age-based consumer constructs and touted its DTC supply chain capabilities:

> Additionally, ***we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids' and continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation***.

On March 21, 2023, NIKE issued a press release entitled "NIKE, Inc. Reports Fiscal 2023 Third Quarter Results." In the press release, Donahoe again claimed that the CDA strategy was working: "***NIKE's strong results in the third quarter offer continued proof of the success of our Consumer Direct Acceleration strategy***."

During a March 21, 2023 FY 2023 Q3 Earnings Call ("March 21, 2023 Earnings Call"), in response to a J.P. Morgan analyst's question regarding "market share acceleration opportunities" and "the forward-looking product pipeline," Donahoe falsely touted NIKE's innovative product pipeline. Specifically, Donahoe stated: "***[T]he breadth and depth of the innovation pipeline is really strong.*** And what's clear is as we return to the office, as our teams are now back together in person, that NIKE magic of consumer insight driving product innovation, combined with storytelling, combined with marketplace, is really picking up steam."

On May 24, 2023, NIKE issued a press release, entitled "NIKE Announces Senior Leadership Changes to Deepen Consumer-Led Growth and Marketplace Advantage." In the press release, Donahoe stated: "***Our brand momentum is strong, our innovation pipeline is unmatched, and our strategy is working***."

Analysts were encouraged by claims about the continued success of the CDA strategy and its product innovation pipeline. For instance, in a March 22, 2023 report, UBS wrote: "We continue to view Nike as a long-term outperformer.... ***Nike's investments in product innovation, supply chain speed, and digital are unlocking what is likely a multiyear period of above average growth***."

On April 6, 2023, NIKE filed its Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2023, which was signed by Friend. The Form 10-Q falsely claimed NIKE had successfully reorganized its business around gender and age-based consumer constructs and touted its DTC supply chain:

> Additionally, ***we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids' and continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation***.

On June 29, 2023, NIKE issued a press release, entitled "NIKE, Inc. Reports Fiscal 2023 Fourth Quarter and Full Year Results." In the press release, Donahoe falsely assured investors that the CDA strategy was working, including because of NIKE's continued competitive separation and product innovation. Specifically, Donahoe stated: "***NIKE's strong results make clear that our***

***strategy is working***.... FY23 was a milestone year for NIKE ***as our unique advantages continue to drive competitive separation. Our investment in innovation and our digital leadership are fueling broad-based growth*** across our portfolio of brands, as we create value by serving the future of sport."

On June 29, 2023, NIKE held its FY 2023 Q4 Earnings Call ("June 29, 2023 Earnings Call"). During the call, Donahoe falsely touted the success of the CDA strategy and NIKE's competitive standing: "Fiscal '23 was a milestone year for NIKE, as we set new records while delivering on our operational and financial goals. ***It's clear that our strategy is working, and that NIKE's unique advantages continue to drive competitive separation***."

During the June 29, 2023 Earnings Call, Donahoe also falsely assured investors of the CDA strategy's continued success. In particular, he stated: "***In the end, our CDA strategy is working***. Our brands have strong energy, our innovation pipeline is as relentless as ever, and we are executing against what matters most to consumers. Looking to FY24, Nike will occupy the same leadership position that we earn year after year, as we usher our industry into the future."

During the same call, Friend falsely maintained that NIKE had increased its competitive separation. Specifically, friend stated: "***Throughout the year, we drove competitive separation*** by doing what Nike does best, serve athletes with product innovation and rich storytelling, amplify our brand voice through key sport and consumer moments… deepen consumer connections across our portfolio and actively manage the marketplace to drive sustainable profitable growth." (Omission in original.)

During the June 29, 2023 Earnings Call, Friend falsely touted NIKE's partnership with Adobe in claiming that NIKE had developed key DTC technological capabilities, including consumer personalization. In particular, Friend stated:

> By better knowing and serving the consumers who love our brands, we are also unlocking strategic and financial benefits for Nike. ***For example, we have partnered with Adobe to enable 1:1 member personalization, driving gains in member retention, click-thru rates, and conversion, resulting in higher demand per member and returns on digital ad spend.*** We are only beginning to operationalize these new capabilities and consumer experiences on our digital platforms, and we see even greater opportunity to come.

Analyst coverage shows that investors were misled by the above misstatements. For example, J.P. Morgan published an analyst report on June 30, 2023, giving NIKE an "Overweight" stock rating and specifically quoted Donahoe's misrepresentation that ***"[i]n the end our CDA strategy is working" as an example of a key "takeaway" from NIKE's earnings call the day before***.

On July 20, 2023, NIKE filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2023 ("July 2023 10-K"), which was signed by Donahoe and Friend. The July 2023 10-K stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and

"develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "***could have a material adverse effect on our sales and profitability***."

The July 2023 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing. The July 2023 10-K stated: "***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***" The July 2023 10-K included an additional materially misleading risk disclosure regarding NIKE's brand strength, in which it stated that a potential "[f]ailure to maintain our reputation, brand image and culture could negatively impact our business." Further, the July 2023 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards***.

At NIKE's September 12, 2023 Annual Shareholder Meeting, in response to a shareholder question read by Parker regarding whether NIKE had "changed" its strategy considering recent "headlines about re-entering various wholesalers[,]" Donahoe misleadingly claimed that NIKE had not altered its wholesale and DTC strategies. In particular, Donahoe stated: "***[O]ur marketplace strategy remains the same*** - simply put our focus is to serve consumers with what they want, when they want it and how they want it. Nike creates distinction across the marketplace by segmenting our consumer experiences to drive deep, and direct connections with consumers across all channels." At NIKE's September 12, 2023 Annual Shareholder Meeting, in response to a shareholder question read by Parker about NIKE's innovation pipeline, O'Neill falsely claimed that NIKE's innovation pipeline enabled it to maintain its leading competitive position:

> Our Consumer Direct Acceleration strategy continues to unlock our future growth potential by powering up our holistic offense across product, innovation, storytelling and marketplace, all fueled by consumer insights and the voice of the athletes. Everything we do starts with listening to the voice of the athlete. And our pipeline is built to serve consumers across all sports, all geographies and all levels of play from elite to everyday athletes. And more and more, we're evolving from sponsorship to partnership, meeting athletes where they are and doing what we do best: turning insights into actions. Some examples include Nike's Athlete Think Tank; Serena Williams Design Crew; and Megan Rapinoe's Victory Redefined Collection.
>
> Our consumer insights, research and development, and ***innovation pipeline continue to keep us in the lead***.

On September 28, 2023, NIKE held its FY 2024 Q1 Earnings Call ("September 28, 2023 Earnings Call"). During the call, Donahoe falsely touted NIKE's purportedly "strong" innovative product pipeline:

> Our teams have been back together in-person over the past 15 months, and ***our innovation pipeline is strong*** and it was on full display. The excitement and alignment of our Leadership Team was clear, as we continue to obsess the product and storytelling we'll be bringing to life for consumers at the Paris Olympics and into the fall. Simply put, our teams are on the offense, as we compete to win, in all segments.

The materially false and misleading statements discussed above concerned NIKE's: (i) DTC supply chain; (ii) technological capabilities and organization; (iii) streamlined corporate reorganization; (iv) innovative product pipeline; (v) competitive standing and brand distinction; (vi) successful channel mix between wholesale and DTC; and (vii) CDA's overall success. Several of the misstatements discussed above touted NIKE's success in developing an effective DTC supply chain. These representations were material to investors' assessment of the CDA strategy because the CDA strategy's success hinged on NIKE developing an effective DTC supply chain as, without one, NIKE could not successfully distribute merchandise to meet consumer demand. However, NIKE failed to develop an effective DTC supply chain, thereby impeding the CDA strategy from the start. NIKE did not have sufficient capabilities to manage its supply chain as it emphasized pivoting towards DTC operations, and did not sufficiently invest in supply chain management. Multiple, well-placed confidential witnesses in the Securities Class Action and other allegations, including NIKE's fiduciaries' own later admissions, set forth that these severe supply chain problems: (i) predated the misstatements; (ii) persisted during the misstatements; (iii) were repeatedly raised to NIKE's senior management; and (iv) contributed to NIKE reducing its targeted openings of NIKE Live Stores by no later than July 2022.

Several of the misstatements discussed above claimed that NIKE had developed the technological capabilities necessary to support NIKE's CDA strategy or had a technology organization that would ensure these technological capabilities were successfully developed and deployed. These representations were material to investors' assessment of the CDA strategy because the CDA strategy depended on NIKE building out and unifying its DTC technological capabilities and organization. However, NIKE had failed to successfully build out these technological capabilities and organization, which were critical for the CDA strategy to succeed. For example, based on the accounts of numerous confidential witnesses in the Securities Class Action and including NIKE's fiduciaries' own later admissions: (i) NIKE had experienced an exodus of technology talent, hindering its ability to support the CDA strategy; (ii) the Company's technology necessary to support the CDA strategy, including marketing personalization technology, was antiquated; (iii) NIKE's corporate reorganization, pursuant to the CDA strategy, forced the Company to engage in complex and time-consuming projects, leading to delays of other technology projects critical to the CDA strategy's success; (iv) NIKE's expensive partnership with Adobe to build critical DTC marketing and other technology was known to be a failure as soon as it began in 2021, as Adobe merely duplicated certain technological capabilities and failed to build

out others; (v) by January or February 2022 at the latest, Donahoe and other fiduciaries had begun holding regular meetings with key technology personnel to discuss the severe and persistent problems with the DTC technological capabilities and organization necessary for the CDA strategy to succeed; and (vi) former Chief Digital Information Officer Ratnakar Lavu ("Lavu") engaged in corruption and created a "shadow" technology group that duplicated and refused to work with preexisting NIKE teams, which substantially undermined the technology organization's efforts to develop the essential DTC technological capabilities, and by the end of 2021, NIKE's fiduciaries knew that these problems were inhibiting the success of the CDA strategy, eventually leading to Lavu's suspicious departure in February 2023.

Several of the misstatements described above touted the success of NIKE's corporate reorganization, pursuant to the CDA strategy, which included refocusing NIKE's business along gender and age-based consumer constructs instead of sport-based categories. These representations were material to investors' assessment of the CDA strategy because the CDA strategy depended on NIKE successfully establishing a streamlined organizational structure, including by successfully reorganizing its business around gender-and-age consumer constructs. However, this reorganization also was a disaster, thus further undermining the success of the CDA strategy. Based on the accounts of numerous confidential witnesses in the Securities Class Action and other sources, including NIKE's fiduciaries' own subsequent admissions: (i) within six months of NIKE launching its reorganization in summer 2020, the Company lost substantial expertise and experience in sports categories due to layoffs, which further jeopardized the success of the CDA strategy; (ii) by no later than summer 2022, NIKE began implementing a reversion to its pre-CDA sport-based categorization model to address concerns with the Company's lagging performance under the gender and age-based model; (iii) and NIKE's fiduciaries admitted that, by June 2023, the failure of NIKE's initial reorganization, pursuant to the CDA strategy, had forced the Company to formally backtrack to the sport-based categories once again.

Several of the misstatements discussed above touted NIKE's innovative product pipeline. These representations were material to investors' assessment of the CDA strategy because maintaining an innovative product pipeline to meet consumer demand was a foundational requirement of the CDA strategy. However, NIKE failed to maintain its innovative product pipeline and instead relied on unsustainably flooding with the market with its classic franchises. For example, according to the allegations of former NIKE employees and the Company's own admissions: (i) NIKE's "lack of innovation" "originated" with the CDA strategy's reorganization in 2020; (ii) by early 2021, NIKE began unsustainably flooding the market with its key classic products (which became a "dirty secret" internally at NIKE); (iii) by 2022, it was apparent internally that NIKE's reorganization had impeded its ability to produce innovative products; (iv) by July 2022, product pipeline problems contributed to NIKE reducing its targeted openings of NIKE Live Stores; and (v) by early 2023, NIKE had begun "rebuilding" its innovation pipeline, as rising new competitors with more innovative products eroded NIKE's market share.

Several of the misstatements described above claimed that NIKE had maintained or enhanced its brand equity or competitive standing. These representations were material to investors' assessment of the CDA strategy because the CDA strategy required NIKE to maintain

its competitive separation and brand distinction. However, NIKE's brand equity and competitive standing declined, thereby inhibiting the success of the CDA strategy. For example, based on the accounts of numerous confidential witnesses in the Securities Class Action and other sources, including the Company's fiduciaries' own later admissions: (i) by no later than summer 2021, NIKE had begun losing customer accounts and market share to growing new competitors such as On and Hoka, at which point NIKE began exploring expanding credit lines for customers in an effort to build back the Company's running shoe business; and (ii) by May 2022, NIKE's critical "cool" marketing metric showed that NIKE was no longer the number one cool brand in North America and that NIKE was losing ground to its competitors, such as Adidas and Lululemon, according to this metric.

Several of the misstatements described above claimed that NIKE had effectively shifted a significant amount of its business away from its wholesale partners to its mono-brand channels, while successfully meeting consumer demand. These representations were material to investors' assessment of the CDA strategy because the CDA strategy depended on NIKE effectively responding to consumer demand for multi-brand vs. mono-brand shopping. However, NIKE failed to effectively respond to consumer demand for multi-brand shopping, thereby further undermining the success of the CDA strategy. For example, according to multiple confidential witnesses and other sources, including NIKE's fiduciaries' own admissions: (i) by early 2021, the sell-through rates for new DTC products reflected that the DTC strategy was faltering, and a former NIKE Vice President for Global Marketplace Integration voiced concerns regarding the sustainability of NIKE's marketplace strategy because wholesale partners were an "anchor" of NIKE's business; (ii) by the fall of 2021, NIKE was dependent on multi-brand retailers to rescue it from its failing CDA strategy; and (iii) NIKE's mono-brand stores were performing poorly by no later than early 2022, thus also imperiling the success of the CDA strategy.

Several of the misstatements above claimed that NIKE's CDA strategy was succeeding. These statements conveyed to investors that NIKE was successfully building out or maintaining certain key aspects of its business that were critical components of the CDA strategy, including: (i) developing an effective DTC supply chain; (ii) enhancing NIKE's DTC technological capabilities and establishing an effective technology organization to support those capabilities; (iii) engaging in a corporate reorganization to focus on DTC initiatives, including the creation of new consumer constructs; (iv) maintaining a robust pipeline of innovative products while effectively managing supply of NIKE's key products; (v) maintaining its competitive separation and brand strength; and (vi) effectively adapting to consumer demand patterns regarding shopping at mono-brand and multi-brand retail stores. As described immediately above, however, per numerous corroboratory sources, including nineteen confidential witnesses in the Securities Class Action, NIKE was failing to achieve each of these critical components of the CDA strategy, thus ensuring the demise of the CDA strategy.

In addition, these statements conveyed that NIKE's CDA strategy was succeeding overall, which investors understood to mean that the CDA strategy was propelling long-term sustainable growth for NIKE. However, NIKE's initial DTC growth was not driven by any purported success of the CDA strategy, but instead by temporary, unrelated factors, and the CDA strategy was

doomed to fail given the numerous severe problems in its critical components, like the DTC supply chain and technology. For example, (i) the initial growth of NIKE's DTC channels was driven by the COVID-19 pandemic, which began just before the launch of the CDA strategy and drove consumers to online shopping temporarily, NIKE's pre-CDA pipeline of products, and NIKE's oversaturation of the market with key classic products; and (ii) a legion of internal warning signs showed NIKE's fiduciaries that the CDA strategy was failing and that NIKE's initial financial growth was unsustainable long-term.

**The Truth Slowly Emerges as the Company's Fiduciaries Continue to Make Materially False and Misleading Statements**

Investors began to learn the truth about the CDA strategy's failure on December 21, 2023. On December 21, 2023, for the first time, the failure of the CDA strategy was partially revealed. On December 21, 2023, in a press release, NIKE announced disappointing financial results for the second quarter of FY 2024. NIKE disclosed quarterly revenue of $13.4 billion, which was approximately $69 million below analysts' consensus estimate of $13.45 billion. NIKE also disclosed that its Direct revenue was $5.7 billion, below the consensus estimate of $5.88 billion. These disappointing financial results, which revealed particular softness in NIKE Direct revenue—the DTC segment at the core of the CDA strategy—began to show investors that the CDA strategy was failing to deliver the sustainable growth that NIKE's fiduciaries had touted.

NIKE concurrently lowered its financial guidance for FY 2024, revealing to investors that the CDA strategy's failures would have ongoing negative consequences for the Company's business. In particular, on NIKE's December 21, 2023 Earnings Call (the " December 21, 2023 Earnings Call"), Friend stated that NIKE "expect[ed] Q3 reported revenue to be slightly negative as we again compare to double-digit growth in the prior year and Q4 reported revenue to be up low single digits, with full year reported revenue now growing approximately 1%." This contrasted with NIKE's prior financial guidance announced on the Company's September 28, 2023 Earnings Call, where Friend stated that the Company expected "reported revenue to grow mid-single digits." During the December 21, 2023 Earnings Call, Friend cited several factors to explain the lowered guidance, including "adjusted digital growth plans based on recent digital traffic softness ... higher marketplace promotions [and] lifecycle management of key product franchises." Thus, NIKE revealed that it was anticipating slower growth in its Digital channels—i.e., a key part of DTC segment that was expected to fuel NIKE's growth as part of the CDA strategy—because of low customer traffic on those platforms (i.e., website, mobile apps, and the like) and the necessity to discount and reduce the supply of (i.e., "manage[]") key product franchises to account for lagging demand. Friend provided additional color on NIKE's oversupply of its key product franchises, stating that NIKE was "stepping up our plans to reduce marketplace supply of our key franchises[,]" and that the Company was facing "increased macro headwinds, especially on Digital."

During the December 21, 2023 Earnings Call, Friend also announced that NIKE was forced to initiate massive cost-cutting measures due to the CDA strategy's failure. Specifically, Friend disclosed that NIKE was "identifying opportunities across the [C]ompany to deliver up to $2

billion in cumulative cost savings over the next 3 years, both up and down our P&L and across our value chain." Friend explained that this reorganization was necessary because the CDA strategy had added "***complexity and inefficiency***" to NIKE's operations. In the same call, Donahoe also disclosed that he knew NIKE "***must be faster, increasing the pace of innovation***, increasing the pace of market to consumer and increasing our agility and responsiveness[,]" and that during "[t]he second half of fiscal '24 represents the ***start of a multiyear product innovation cycle*** that will introduce new franchises, concepts and platforms, elevating our full portfolio. And while there'll be some key moments in the second half, ***this new innovation cycle will take some time to fully ramp up, given our size and scale.***" These disclosures partially revealed to investors not only that the CDA strategy was failing, but that under this CDA strategy, NIKE had been failing to adequately invest in product innovation, resulting in innovation stagnation, which endangered NIKE's brand strength and competitive position and now needed to be reversed using this new initiative of "a multiyear product innovation cycle."

On this news, the price of NIKE stock declined $15.40 per share, or over 12%, from a close of $122.53 per share on December 21, 2023, to close at $107.13 per share on December 27, 2023, a $18.7 billion loss in market capitalization.

Investors and analysts were surprised and disappointed by these revelations. For example, in a December 22, 2023 report, Morgan Stanley wrote that "the magnitude of [NIKE's] cut surprised to the downside," and explained that this revenue guidance cut was due to factors such as "digital channel softness [and] intentional supply reduction of key product franchises." This report further stated that these factors "sent NKE stock -12%." Similarly, in a December 22, 2023 report, UBS noted that "Nike announced an uncharacteristic plan to reduce costs by $2B over 3 years.... Nike will use some cost saves to accelerate innovation and improve speed. This is surprising since these have been objectives for the last 5+ years. We assumed Nike made more progress in these areas."

On December 22, 2023, analysts at Cowen Research decreased their NIKE stock target price from $129.00 to $104.00, Evercore ISI downgraded their target price from $137.00 to $122.00, and Raymond James downgraded their target price from $130.00 to $124.00. HSBC Global Research, assigning a "Hold" rating, wrote on December 21, 2023 that if "you want to buy sales growth, look somewhere else" besides NIKE stock—as "the Nike brand [h]as not [been] where it should be on running, and we have made the case that it has been bleeding market share to more nimble players in both footwear and apparel." On the same date, Seaport Research Partners issued a report assigning NIKE stock a "Neutral" rating and noting that "2Q24 looked pretty bad for Nike, Jordan, and Converse." They added:

> Compared to N[I]KE, we continue to see momentum across certain athletic brands, namely HOKA and New Balance, which we believe are eating into N[I]KE's market share for running shoes. Also, we believe that adidas is eating into N[I]KE's market share for court shoes. We believe that footwear demand, especially athletic footwear, is driven by key franchises. As such, we suspect that N[I]KE is being

> negatively impacted by weakness across certain key footwear franchises, and that is partly due to the strength of certain competitor franchises.

Still, the Company's stock remained artificially inflated, even after this news, as NIKE's fiduciaries continued to reassure the market that the CDA strategy was working. For instance, on the December 21, 2023 Earnings Call, Donahoe misleadingly reassured investors that NIKE's latest reorganization efforts around the gender and age-based consumer constructs had been effective: "6 months ago, we realigned our entire organization under Heidi O'Neill and Craig Williams as our co-Presidents. And it is making a huge difference in our focus and ability to execute." Donahoe continued: "[W]e're single-mindedly focused on aligning our entire team to drive what NIKE does best[:] innovative product combined with distinctive storytelling combined with unique marketplace experiences. And as Matt just said, we have a real focus, Heidi, Craig and team, a real focus on newness and driving our next product innovation cycle, which will elevate our entire portfolio[.]"

On the December 21, 2023 Earnings Call, Friend further reassured investors that NIKE was managing the supply of its key products, stating "our top franchises continue to drive strong full-price sales, but we intentionally manage the life cycle of these models across the marketplace for long-term value." Friend also claimed NIKE was seeing strong consumer demand due to its innovative products, stating "we saw strong consumer response to newness and premium innovation." Friend further reassured investors that NIKE's strategies would allow to drive growth:

> Taken all together, strong gross margin execution and disciplined cost controls are enabling us to offset softer second half revenue and drive earnings growth. Excluding restructuring charges, we expect to deliver on our prior full-year earnings outlook.
>
> While we expect the operating environment to remain dynamic, we have been here before and we know that moments like this are when NIKE operates and executes at its best.

Analysts were reassured by the positive statements. For instance, on December 22, 2023, Deutsche Bank Research assigned NIKE stock a "Buy" rating and wrote that it viewed NIKE's cost cutting efforts "positively as they are geared toward streamlining the organization, accelerating innovation, and increasing speed to market, all aiming to drive greater profitability."

The truth behind the CDA strategy's failure was further partially revealed on March 21, 2024, when NIKE announced its financial results for Q3 2024 and lowered its gross margin guidance for FY 2024. The Company advised investors they expected NIKE's full year gross margins to expand only 120 basis points, in contrast to the expected full year gross margin expansion of 140 to 160 basis points announced in the December 21, 2023 Earnings Call. As described earlier, analysts believed the CDA strategy was critical to expanding NIKE's margins and, therefore, this lowered margins guidance partially revealed the CDA strategy's failure. The Company also attributed NIKE's disappointing guidance to the CDA strategy's failure, thus further partially revealing that the CDA strategy was failing to propel long-term, sustainable growth. In

particular, on NIKE's March 21, 2024 earnings call discussing these results, Friend attributed NIKE's lowered margins guidance to several factors, including "higher markdowns [and] reduced benefits from channel mix due to franchise lifecycle management[.]" On the same call, Friend similarly disclosed that NIKE expected "revenue in the first half of the fiscal year [FY 2025] to be down low single-digits[,]" which he attributed "near-term headwinds from lifecycle management of our key product franchises[.]" Thus, Friend revealed on this call that NIKE had misaligned the supply of these "franchises" (i.e., classic products) so poorly that NIKE's remedial measures to limit the supply of these products had forced NIKE to cut its margin guidance and revenue guidance. Friend further explained that "[l]ooking ahead, we expect lifecycle management of key product franchises to create some near-term headwinds, particularly on Digital."

NIKE needed to engage in this drastic reduction of supply because the Company had flooded the market with its classic franchises. This was necessary because NIKE had failed to produce new innovative products as part of the CDA strategy. Indeed, during this call Donahoe partially revealed that NIKE had failed to effectively innovate as part of the CDA strategy, stating that "we must drive a continuous flow of new product innovation." Friend elaborated, stating that NIKE had to "shift our product portfolio toward newness and innovation." Donahoe also admitted that NIKE had been "missing some product newness at scale in our portfolio over the last several seasons," which partially revealed to investors that NIKE had failed to maintain an innovative product pipeline for at least several months preceding this announcement.

Donahoe also elaborated on additional aspects of the CDA strategy's failures. Specifically, Donahoe admitted that the CDA strategy's failures required that NIKE make substantial adjustments in four key areas, including that NIKE would (i) refocus back to sport categories; (ii) increase innovation; (iii) strengthen its brand marketing; and (iv) shift back to its wholesale partners to reach its sales goals (and thus effectively pulling back from its DTC channels). In particular, he stated:

> While our Consumer Direct Acceleration Strategy has driven growth and direct connections with consumers, ***it's been clear that we need to make some important adjustments***.
>
> Simply put, we need to make adjustments in ***four areas. We need to sharpen our focus on sport/ We must drive a continuous flow of new product innovation. Our brand marketing must become bolder and more distinctive***. And while NIKE Direct will continue to play a critical role, ***we must lean in with our wholesale partners*** to elevate our brand and grow the total marketplace.

Donahoe further explained that NIKE had started making such major adjustments in June 2023, stating ***"[s]tarting last June, we aligned our organization to put the consumer and a sharp focus on sport back at the center of everything we do.*** We integrated our leadership structure, appointing Heidi O'Neill and Craig Williams as co-Presidents." These statements partially revealed that the CDA strategy had failed to effectively align NIKE's business, maintain NIKE's innovative product pipeline, preserve NIKE's brand strength and competitive position, and successfully pivot to DTC channel sales and away from its wholesale partners.

Donahoe also elaborated on the CDA strategy's failure to pivot away from sport-based categories. Specifically, Donahoe explained that NIKE had "***started [nine] months ago [i.e., in June 2023] important adjustments in our offense***[,]" including "putting the consumer ***and sport*** squarely back into our offense." In other words, Donahoe partially revealed that NIKE's CDA reorganization—in particular, around the consumer constructs of Men's, Women's, and Kids'—had failed, forcing the Company to revert to organizing around sport-based categories, as it did before the CDA strategy. Thus, Donahoe confirmed he had been aware of the CDA's failure since at least summer 2023.

Donahoe and Friend also partially revealed that NIKE failed to effectively respond to consumer demand for multi-brand shopping by pivoting towards DTC and away from its wholesale retail partners. Specifically, Donahoe stated that NIKE: (i) was "increasing our investment in wholesale to help us elevate and grow the entire marketplace"; (ii) "recognize[d] that our wholesale partners help us scale our innovation and newness in physical stores and connect our brands in the path of the consumer"; (iii) "must lean in with our wholesale partners to elevate our brand and grow the total marketplace"; and (iv) had engaged in a "reinvestment with our wholesale partners, so we bring a more holistic offense that grows the market and gets in the path of our consumer[,]" and that this combination was "driving [NIKE's] growth." Friend admitted NIKE had knowingly disregarded consumer demand for multi-brand shopping so that the Company could hit performance metrics: "we've been more focused on trying to achieve [a] mix of marketplace targets than we have serving consumer demand where the consumer is shopping." Friend then went on, admitting further that "[t]he consumer is still clearly shopping in multi-brand retail, and we need to elevate our brand and our positioning to be able to serve the consumer."

On this earnings call, Donahoe also partially revealed that NIKE had failed to drive competitive separation. In particular, he stated that the Company's "brand marketing must become bolder and more distinctive[,]" thus partially revealing that NIKE's brand equity and competitive standing had diminished.

On this news, the price of NIKE stock declined $8.24 per share, or over 8%, from a close of $100.82 per share on March 21, 2024, to close at $92.58 per share on March 26, 2024, a $9.9 billion loss in market capitalization.

Analysts were again surprised at NIKE's poor financial results and extent of the CDA strategy's failure revealed in these disclosures. For instance, in a March 21, 2024 report, Jeffries Equity Research assigned NIKE stock a "Hold" rating, lowered their price target from $110.00 to $100.00, and pointed out the "slowing trend ahead for revenue growth as old style inventory is reduced and markdowns increase." In the same report, Jeffries Equity Research also noted that "[f]or years [NIKE] pushed a narrative it would increase digital/direct and reduce wholesale to improve margins and maximize customer impact. Problem is customers want to buy NIKE everywhere so reducing wholesale dramatically seems like the wrong move in hindsight." Jeffries further stated: "Now the company is left trying to figure out what the optimal mix between direct and wholesale should be, and we won't find that answer until an analyst day later this year." Similarly, in a March 21, 2024 report, Piper Sandler assigned NIKE stock a "Neutral" rating,

lowered their price target from $107.00 to $98.00, and wrote that NIKE's "[p]roduct lifestyle management will pressure near-term sales as [NIKE] refocuses on product innovation and reinvesting in wholesale." Likewise, in a March 21, 2024 report maintaining NIKE stock's "Overweight" rating but reducing the target price from $125.00 to $120.00, Wells Fargo Equity Research warned that NIKE's "franchise management will clearly be more of a headwind to the DTC/digital channel[,]" because there was a greater excess of key product franchises in NIKE's digital channels. And, in a March 22, 2024 report, Telsey Advisory Group maintained its "Outperform" rating but lowered its price target from $120.00 to $115.00, stating that "NIKE has realized consumers like shopping at multi-brand retailers and wants [to] gain share and improve its presence at retail. In addition, NIKE admitted it had been too focused on hitting its DTC and digital sales targets vs. serving consumer demand."

Various media outlets also reported on NIKE's disclosures of the CDA strategy's failure. For example, the March 21, 2024 admissions regarding NIKE's failure to meet consumer demand for multi-brand retail shopping were discussed in a March 22, 2024 article in SGB Media, titled "NIKE Admits it Has a Problem, and Its Solution is… Air?" When discussing the March 21, 2024 earnings call, this article noted that "[t]he big moment for the marketplace may have come when the CEO said that NIKE is increasing its investment in wholesale to elevate and grow the market." This, the article explained, that "NIKE should not have turned its back on its retail partners and upset the delicate balance of the marketplace ecosystem. Instead, they opened the door for other brands like Hoka, On and New Balance to move into leadership positions in the innovation pipeline. NIKE missed big on the partnership approach with larger retailers that let other fashion-forward innovators take the shelf space NIKE walked away from over the last few years." The article quoted a note to investors by Amalthea Fund stating that "NIKE used to have 30,000 wholesale arrangements (retailers who sold their product). They cut this number sharply, down to 3,000 and told people they were going to 1,800."

Still, the Company's stock remained artificially inflated, even after this news, as NIKE's fiduciaries continued to reassure the market that the CDA strategy was working. For example, while acknowledging that NIKE needed to make certain "adjustments" to the CDA strategy, Donahoe continued to tout its success, falsely claiming that "[o]ur Consumer Direct Acceleration strategy has driven growth and direct connections with consumers." Donahoe also continued to minimize the plight of the CDA strategy, claiming that NIKE was "making significant progress ... building a multi-year cycle of innovation that's bringing freshness and newness to consumers[.]" On the same earnings call, Donahoe similarly downplayed NIKE's dire situation, claiming that Company was "back on our front foot with growing confidence in our innovation pipeline[,]" and "our innovation engine is moving with speed."

Analysts were comforted by the reassurances and minimizations of NIKE's CDA problems. For instance, in a March 21, 2024 report, Cowen Research wrote that "[w]e believe direct to consumer expansion and [NIKE's] Consumer Direct Acceleration strategy could create a multi-year inflection in gross margin past prior peaks." Likewise, in a March 21, 2024 report assigning NIKE stock a "Buy" rating, Guggenheim Securities, LLC opined that "we continue to look favorably upon Nike's innovation pipeline and the ability to scale newness across the marketplace,

including its wholesale partners." Similarly, in a March 22, 2024 report, Bernstein Research assigned NIKE stock an "Outperform" rating and noted that NIKE management had told investors that "[i]nnovation is finally coming."

The truth behind the CDA strategy's failure was further partially revealed on June 27, 2024, when NIKE announced a third consecutive quarter of disappointing financial results, along with poor results for FY 2024. NIKE's poor financial results included revenue for the fourth quarter of $12.6 billion, which missed consensus estimates by $250 million. On NIKE's June 27, 2024 earnings call, Friend explained that the disappointing results stemmed, in part, from a decline in NIKE Digital sales of 10% and "lower sales of certain classic footwear franchises." Thus, NIKE's poor results were caused by the CDA strategy's failure to drive sales toward NIKE's DTC channels and the fact that NIKE had flooded the market with an over-supply of its classic franchises, leading to lower sales.

NIKE also announced that it was lowering its revenue guidance for FY 2025 and expected revenue growth in the first half and first quarter of FY 2025 to be materially constrained due to the CDA strategy's failure. Specifically, NIKE significantly reduced its guidance for FY 2025, with Friend stating that "we now expect Fiscal 2025 reported revenue to be down mid-single-digits, with the first half down high single-digits." As described below, in a related earnings call NIKE's fiduciaries attributed NIKE's disappointing guidance to the CDA strategy's failure, thus further partially revealing that the CDA strategy was failing to propel long term, sustainable growth.

In particular, on NIKE's June 27, 2024 Earnings Call, Friend explained that NIKE had lowered its guidance due to factors such as "timelines and pacing to manage marketplace supply of our classic footwear franchises[,]" and "lower NIKE Digital growth ... as we scale product innovation and newness across the marketplace[.]" Friend then elaborated further, explaining that NIKE was "advancing our timelines to tighten total supply of certain classic footwear franchises[,]" causing NIKE to "aggressively adjust[] our forward-looking plans for these franchises on NIKE Digital, where they have their highest share of business." These actions, according to Friend, "create several points of short-term headwinds on revenue in Fiscal 2025." Later in the earnings call, Friend added that NIKE had "started managing these franchises a couple years ago, and what we were most focused on was the fact that we needed to restrict supply of these franchises into the marketplace, because we had a gap in innovation in our pipeline[.]" Thus, Friend directly admitted that he knew NIKE "had a gap … in our pipeline" at least "a couple years ago"—i.e., no later than summer 2022. As the confidential witnesses in the Securities Class Action recounted this directly contradicted previous statements touting NIKE's product innovation pipeline at the time and afterwards.

Similarly, during this earnings call, Friend stated that NIKE expected for FY 2025 that "first-quarter revenue to be down approximately 10%[,]" which he attributed to several factors, including "more aggressive actions in managing our classic footwear franchises; continuing challenges on NIKE Digital; muted wholesale order books, with newness not yet at scale[.]" This admission further revealed the damage caused by NIKE's CDA-era oversupply of classic product franchises. Thus, Friend attributed NIKE's disappointing financial forecasts to a lack of innovation

and the fact that, due to this lack of innovation, NIKE had flooded the market with an over-supply of its classic franchises. Now, NIKE had been forced to accelerate its reduction of the supply of those franchises. In other words, NIKE revealed that its franchise management plan—i.e., its plan to intentionally pull its classic products off the market—was inflicting even greater pain on NIKE's revenue outlook than was previously disclosed, particularly when combined with the fact that NIKE's lacked "newness" (i.e., innovative products) to fill the gap.

During the earnings call, Donahoe and Friend further elaborated on the various key problems underlying CDA strategy's failures. Specifically, Donahoe stated that NIKE was "moving aggressively to reestablish our innovation edge" and noted that "[f]or NIKE, Fiscal 2024 was a pivotal year to get back on the offense in sport with consumers, led by an urgency to accelerate our pace of innovation and scale newness across our product line." Similarly, Friend reiterated that NIKE needed to "scale product innovation and newness across the marketplace[.]"

Donahoe also provided additional color on how the failure of the CDA strategy had forced NIKE to depend on its wholesale partners to sell key products. For instance, Donahoe admitted that NIKE had "spent a lot of time leaning in with our wholesale partners." This disclosure indicated that consumer demand for multi-brand shopping made NIKE dependent on its wholesale partners, thus acknowledging that a central component of the CDA strategy (the shift away from wholesale partners) had failed. Donahoe also stated that NIKE wanted "to be where the consumer is, whether that's digital, our own door, or wholesale, and so we're embracing a more balanced approach to growing the whole marketplace." Friend then confirmed that NIKE was "building momentum with our wholesale partners" and that the volatility in NIKE's financial results had been driven by "the dynamic of increasing supply ... in the wholesale marketplace relative to having the supply of them on Digital[.]" This acknowledgment indicated that consumer demand for multi-brand shopping had required NIKE to pivot back to emphasizing selling products through its wholesale partners.

Donahoe also further partially revealed that the CDA strategy failed to establish the streamlined organizational structure regarding consumer constructs previously promised to investors. Specifically, Donahoe stated that NIKE was "***now completely aligned across the organization around sport field of play***[,]" and that "over the last 90 days, we've completed completely aligning our organization along the lines of sport[.]" He also acknowledged that NIKE was "sharpening our focus on sport[.]" This was the first time that the Company acknowledged that the failure of NIKE's reorganization pursuant to the CDA had forced NIKE to once again formally institute sport-based categories like NIKE had done prior to CDA.

Friend also partially revealed that NIKE's brand equity and competitive standing had continued to decline. In particular, Friend admitted that "[a]lthough the next few quarters will be challenging, we are confident that ***we are repositioning NIKE to be more competitive, with a more balanced portfolio to drive sustainable, profitable, long-term growth."*** This statement serves as an admission that NIKE had not previously been well-positioned to compete effectively under the CDA strategy, which thus had failed to drive sustainable, profitable growth.

Finally, Donahoe admitted that NIKE had known the CDA strategy was a failure and thus had initiated a remediation plan since at least summer 2023, stating that NIKE "set out our – what we're calling our comeback plan a year ago." Thus, NIKE's fiduciaries internally had already initiated a "comeback plan" no later than summer 2023—at the same time that they were publicly still professing the continued success of the CDA strategy, including its various key components.

On this news, the price of NIKE stock collapsed $18.82 per share, or nearly 20%, the largest stock price drop in NIKE's history, from a close of $94.19 per share June 27, 2024, to close at $75.37 per share on June 28, 2024, a $22.79 billion loss in market capitalization.

Analysts and investors were shocked by these revelations. For example, in a June 28, 2024 report, analysts at Bernstein Societe Generale Group, despite maintaining NIKE stock's "Outperform" rating, reduced the target price from $120.00 to $112.00 and wrote that a "guidance cut was expected, but the magnitude of it was startling." The report went on to explain that NIKE's "Lifecycle Management process involves cutting distribution on older product to make room for new innovation. The effect is most prominent on their own digital channel, where the majority of the long tail of older product resides." Likewise, in a June 27, 2024 report, maintaining their "BUY" rating but "reducing our PO to $104 (from $113)," Bank of America highlighted that NIKE's "guidance reset was larger than expected as it expedites the reduction in lifestyle franchises in its DTC channel." Similarly, in a June 28, 2024 report, analysts at Raymond James downgraded NIKE stock's rating from "Outperform" to "Market Perform" and noted that "[w]hile Nike's renewed focus on the Wholesale channel drove growth, it also distorts what Nike is aiming for in terms of its [long term] channel mix."

News media commentary further illustrates the market's shocked reaction to the disclosures about the CDA strategy's failures. For example, these revelations were discussed in a July 8, 2024 Financial Times article, titled "Nike's new chief runs into trouble as turnaround efforts falter." Notably, this article stated that NIKE's June 28, 2024 stock price decline was "the single-worst day for the swoosh since its 1980 initial public offering." The article also discussed quality issues with certain NIKE products and quoted a longtime NIKE employee who stated that such quality lapses "'would never have happened" when Nike's internal structure had focused teams for each sport[.]'" The article further explained that "by eschewing longtime wholesale partners, competing brands such as Hoka, On and New Balance took up Nike's market share at chains including Foot Locker."

Still, the Company's stock remained artificially inflated, even after this news, as Donahoe and Friend continued to downplay the disclosed problems. For instance, Donahoe claimed that NIKE's previously announced adjustments were working and that the Company was "seeing momentum build in all four areas, particularly on the performance side of our product portfolio. We have work to do, but we're on it. Our teams are moving with energy and urgency against the opportunity we see in front of us." Donahoe further reassured investors that NIKE was "accelerating our innovation pipeline, including pulling forward several innovations, some more than a year. We're moving aggressively to reestablish our innovation edge."

Donahoe also insisted that "our execution continues to stay on pace." Further, Friend reassured that "our past experience gives us confidence that proactively rebalancing our portfolio will strengthen our competitive position and fuel brand momentum as we take the consumer somewhere new." Friend also stressed that "as we accelerate our pace of newness and innovation, the early response from consumers and partners are reinforcing our optimism in NIKE's path forward." Friend also claimed that "if I exclude the impact of the biggest franchises on our Digital business, the rest of our Digital business was healthy and we were pleased with the growth that it delivered. And so, from that end, we feel comfortable in the way that we're looking at this."

Analysts were comforted by the reassurances. For instance, on June 28, 2024, reiterating a "Buy" rating, Bank of America wrote: "we are encouraged by early signs that innovation is resonating."

On July 25, 2024, NIKE filed its Annual Report on Form 10-K for the fiscal year ended May 31, 2024 (the "July 2024 10-K"), which was signed by Donahoe and Friend. The July 2024 10-K stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "***could have a material adverse effect on our sales and profitability***."

This statement was materially misleading. Hypothetical warnings about NIKE's product offerings—e.g., that a potential failure to adjust the mix of NIKE products and develop new products to meet customer demand "could" negatively impact NIKE's business—were materially misleading because NIKE had already failed to maintain its innovative product pipeline, and instead relied on unsustainably flooding with the market with its classic franchises.

The July 2024 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing. In particular, the July 2024 10-K stated: "***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***" The July 2024 10-K included an additional materially misleading risk disclosure regarding NIKE's brand strength. Specifically, the July 2024 10-K stated that a potential ***"[f]ailure to maintain our reputation, brand image and culture could negatively impact our business."***

This statement was materially misleading. In particular, the hypothetical warnings that NIKE's potential "[f]ailure to maintain our reputation [and] brand image could negatively impact our business" was materially misleading because NIKE's brand equity and competitive standing had already declined, thereby inhibiting the success of the CDA strategy.

Further, the July 2024 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology. In particular, the July 2024 10-K stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and

> upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards***.

This statement was materially misleading. In particular, hypothetical warnings that NIKE "may not be successful" in developing technology critical to NIKE's DTC operations was materially misleading because NIKE already had struggled and failed to build out and unify its DTC technological capabilities and organization, which were critical for the CDA strategy to succeed.

The full truth was finally revealed on October 1, 2024, when NIKE announced its financial results for the first quarter of 2025, which again disappointed the market. In particular, NIKE announced that its first quarter revenue was $11.6 billion, below consensus estimates of $11.65 billion. On the October 1, 2024 earnings call discussing these results, Friend informed investors that NIKE's poor sales for the quarter were driven by "[t]raffic declines across NIKE Direct[,]" including "particular softness in traffic on NIKE Digital[.]" Thus, Friend directly acknowledged that NIKE's continued poor financial results were caused by the CDA strategy's failure to drive sales toward NIKE's DTC channels, and thus achieve the promised sustainable, long-term growth.

During the same earnings call, Friend also disclosed that NIKE was "withdrawing our full year guidance." This announcement indicated that the CDA strategy had failed to the point where NIKE could no longer reliably project its financial outlook. Friend went on to explain that, looking forward, NIKE's "revenue expectations have moderated since the start of the year, given traffic trends on NIKE Digital, retail sales trends across the marketplace, and final order books for spring." Further, the guidance that Friend could provide conveyed the dire state of NIKE's business due to the CDA strategy's failures. Specifically, Friend told investors that NIKE expected "Q2 revenues to be down in the 8% to 10% range.... Q2 gross margins to be down approximately 150 basis points," because of "higher promotions [and] channel mix headwinds[.]"

NIKE's fiduciaries also elaborated on additional aspects of the CDA strategy's failures, thus further revealing the extent of NIKE's DTC problems to the market. For instance, Friend disclosed that the Company's "[f]ranchise management" plan—which was required because of NIKE's previous oversaturation of the market with classic product franchises—was even more destructive to NIKE's revenues than previously disclosed. Specifically, Friend stated that NIKE was "intentionally reducing the proportion of our business driven by our Classic Footwear franchises: Air Force 1, Air Jordan 1, and Dunk[,]" and that "we have taken the most aggressive actions in NIKE Direct, and especially Digital." He then explained that NIKE was "actively rebalancing product allocations to our highest traffic channel in order to maximize franchise health and full price realization." Friend further disclosed that poor results from these classic franchises drove particular sales weakness in NIKE's Digital segment, stating: "On Digital, we did see we were down 20% in the quarter in Digital, and that was largely driven by the 3 classic franchises being down nearly 50% versus the prior year." Thus, Friend revealed that the financial impact of NIKE's

CDA-era practice of oversaturating the market with its classic products was worse than previously disclosed, and was causing the Company ongoing financial harm.

As discussed above, NIKE had originally oversaturated the market with its classic franchises because it lacked an innovative product pipeline, and Friend went on to reveal that NIKE's lack of innovation had persisted, compounding NIKE's CDA strategy failures. During the same call, Friend confirmed that NIKE had been failing to effectively innovate as part of the CDA strategy, saying that that the Company "plan[s] to introduce and scale newness and innovation across the marketplace[,]" and was "focused on trying to accelerate newness and innovation in order to create more momentum with consumers and more energy with consumers."

Friend went on to detail several related unfavorable business trends NIKE had seen in the first quarter of FY 2025—and which NIKE expected to continue into the future—as a result of the CDA strategy's failure, thus further revealing its continuing, severe financial impact on NIKE's business. In particular, Friend stated:

> Our men's and women's lifestyle business was planned down double digits in Q1, and we expect these declines to continue through the year. The Jordan brand was planned down double digits this quarter, and we expect Jordan to be down at the same rate for fiscal '25. ***And we expect NIKE Digital to decline double digits in fiscal '5 versus the prior year. All taken together, these trends drove a mid-single-digit headwind on Q1 revenue***…[f]ranchise management actions will continue throughout the year[.]

Friend also admitted that the CDA strategy had shifted too much towards NIKE's DTC business and thus needed to shift back to its wholesale partners, who had been critical to the Company's prior success. Specifically, he stated that NIKE had "been closely engaging with our partners since we acknowledged some of the missteps related to over-centering on Direct." Indeed, Friend noted that "sales trends ... in the wholesale channel were substantially better" than the Digital sales trends of key product franchises. This further revealed that NIKE's CDA strategy had failed to account for consumer demand for multi-brand shopping.

Finally, Friend also acknowledged that NIKE had lost brand strength and its competitive edge, stating that "the multi-brand environment is very competitive today and it will take time to expand market share." Indeed, he added that NIKE had "acknowledged that we've lost market share in the Running specialty channel. More than 4 years ago, we pulled back on our engagement with that channel. And as a result of that, we saw market share losses." Thus, NIKE admitted that its market share loss to competitors in its key running channel began as a result of its pullback from that channel four years earlier, i.e., in 2020—when the Company launched its disastrous CDA strategy. Thus, Friend directly connected NIKE's diminished competitive standing to its failed CDA strategy.

On this news, the price of NIKE stock declined $7.03 per share, or approximately 7.89%, from a close of $89.13 per share on October 1, 2024, to close at $82.10 per share on October 3, 2024, a $8.3 billion loss in market capitalization.

Investors and analysts were shocked by this final revelation of the CDA strategy's failure. For example, on October 2, 2024, Jeffries assigned NIKE stock a "Hold" rating and emphasized that "Digital is A Big Problem" for NIKE, and noted that "promos are rising, new product will take time to resonate, if it does at all, and in the meantime competition is proving to be more severe." Similarly, on October 2, 2024, Truist reduced NIKE stock's price target to $83.00 from $85.00, assigned a "Hold" rating, and noted that "[w]ith another miss vs depressed expectations, Nike's visibility into its own business appears lower than we previously anticipated." Likewise, in an October 2, 2024 report maintaining its "Market Perform" rating, Raymond James wrote that "[t]raffic decline at Nike Direct was more severe than expected, particularly in Digital."

Moreover, various media outlets directly connected the Company's stock price decline to NIKE's disappointing disclosures about the severity of the CDA strategy's failures and its dire financial impact on NIKE. For instance, an October 1, 2024 article in The Wall Street Journal, titled "Nike Shares Slide After It Withdraws Year Forecast," tied NIKE's disclosures to the decline in its stock price and explained that NIKE had "oversold" key products "and diluted their cool in the process. The company is now aggressively reducing supply of those franchises to save its most iconic sneakers. It is still making more of them than it can sell." Similarly, an October 2, 2024 article in The Wall Street Journal titled, "Nike Needs Time to Get Off the Sidelines," described how the price of NIKE shares declined "as the company made it clear that its turnaround might be more painful than investors thought." In particular, the article described that "Friend made it clear that Nike's deliberate pullback from key franchises—Air Force 1, Air Jordan 1 and Dunk—will continue to weigh on its top line for the rest of its fiscal year." The article also stated that the pivot back to its wholesale partners would not be the quick fix for its CDA-caused problems that NIKE had hoped for, and that NIKE's damaged competitive position may be hard to repair: "The brand's efforts to cozy up to its once-neglected retail partners are having mixed effects. Order books for the coming spring season were roughly flat compared with the prior year, lighter than Nike had hoped. Upstart brands such as Hoka and On have made concerted efforts to fill the shelves that Nike left bare over the past few years; it is clear that re-establishing dominant status with those retail partners won't be easy."

**Insider Trading**

Over the relevant Sales Period,[7] insiders of the Company[8] have sold over $263.1 million worth of their personally held NIKE stock while in possession of material nonpublic information regarding the Company's failing CDA strategy. The sales are also suspicious because they represented 46.63%, 57.07%, 64.45%, 23.88%, and 57.37% of Campion's, Friend's, Matheson's, O'Neill's, and Parker's total stock, respectively. The following details the Insider Sellers' sales:

---

[7] The "Sales Period" is from March 19, 2021 to October 3, 2024.

[8] The "Insider Sellers" are Campion, Donahoe, Friend, Monique Matheson ("Matheson"), O'Neill, and Parker.

**Sales Period: March 19, 2021 - October 3, 2024**

| Insider Last Name | Transaction Date | Transaction Code | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| **CAMPION** | 6/3/2021 | S | 14,307 | $133.20 | $1,905,692.40 |
| **Current Chief Operating Officer** | 8/5/2021 | S | 7,125 | $171.50 | $1,221,937.50 |
| | 6/3/2022 | S | 14,203 | $120.61 | $1,713,023.83 |
| | 8/3/2022 | S | 5,922 | $113.42 | $671,673.24 |
| | | **Total (Sales)** | **41,557** | **Total (Sales)** | **$5,512,326.97** |
| | | | | | |
| **FRIEND** | 6/3/2021 | S | 9,032 | $133.20 | $1,203,062.40 |
| **Current Chief Financial Officer** | 6/15/2021 | S | 7,016 | $131.54 | $922,884.64 |
| | 8/3/2021 | S | 43,000 | $170.00 | $7,310,000.00 |
| | 8/5/2021 | S | 3,546 | $171.50 | $608,139.00 |
| | 6/13/2022 | S | 9,032 | $110.52 | $998,216.64 |
| | 8/3/2022 | S | 4,139 | $113.42 | $469,445.38 |
| | 6/5/2023 | S | 9,210 | $107.50 | $990,075.00 |
| | 8/3/2023 | S | 5,545 | $107.00 | $593,315.00 |
| | 6/5/2024 | S | 9,350 | $95.10 | $889,185.00 |
| | 8/7/2024 | S | 5,410 | $72.88 | $394,280.80 |
| | | **Total** | **105,280** | **Total** | **$14,378,603.86** |
| | | | | | |
| **MATHESON** | 6/25/2021 | S | 10,000 | $152.00 | $1,520,000.00 |
| **Current Chief Human Resources Officer** | 6/29/2021 | S | 30,391 | $155.76 | $4,733,702.16 |
| | 6/29/2021 | S | 10,000 | $155.00 | $1,550,000.00 |
| | 7/5/2022 | S | 5,595 | $103.10 | $576,844.50 |
| | 7/5/2022 | S | 4,405 | $103.91 | $457,723.55 |
| | 7/5/2022 | S | 5,391 | $103.10 | $555,812.10 |
| | 7/5/2022 | S | 4,109 | $103.91 | $426,966.19 |
| | 7/6/2022 | S | 7,325 | $103.99 | $761,726.75 |
| | 7/6/2022 | S | 2,700 | $104.94 | $283,338.00 |
| | 7/7/2022 | S | 6,047 | $106.75 | $645,517.25 |
| | 7/7/2022 | S | 3,615 | $107.81 | $389,733.15 |
| | 7/7/2022 | S | 338 | $108.22 | $36,578.36 |
| | 7/7/2022 | S | 12,155 | $106.76 | $1,297,667.80 |
| | 7/7/2022 | S | 7,317 | $107.83 | $788,992.11 |
| | 7/7/2022 | S | 528 | $108.21 | $57,134.88 |
| | 10/31/2022 | S | 5,882 | $93.55 | $550,280.93 |

| | | | | | |
|---|---|---|---|---|---|
| | 12/7/2022 | S | 5,000 | $109.00 | $545,000.00 |
| | 12/7/2022 | S | 5,000 | $107.32 | $536,600.00 |
| | 12/13/2022 | S | 5,000 | $115.83 | $579,150.00 |
| | 1/6/2023 | S | 5,000 | $124.00 | $620,000.00 |
| | 8/8/2023 | S | 19,792 | $107.98 | $2,137,140.16 |
| | 8/8/2023 | S | 13,870 | $109.00 | $1,511,830.00 |
| | 8/8/2023 | S | 6,338 | $109.61 | $694,708.18 |
| | 12/11/2023 | S | 10,000 | $119.00 | $1,190,000.00 |
| | 5/7/2024 | S | 45,000 | $94.16 | $4,237,200.00 |
| | | **Total** | **230,798** | **Total** | **$26,683,646.07** |
| | | | | | |
| **O'NEILL** | 6/25/2021 | S | 25,000 | $152.00 | $3,800,000.00 |
| **Current President, Consumer, Product & Brand** | 7/21/2021 | S | 13,000 | $160.77 | $2,090,010.00 |
| | 11/3/2021 | S | 4,589 | $170.00 | $780,130.00 |
| | 11/3/2021 | S | 7,500 | $170.00 | $1,275,000.00 |
| | | **Total** | **50,089** | **Total** | **$7,945,140.00** |
| | | | | | |
| **PARKER** | 3/26/2021 | S | 114,094 | $130.67 | $14,908,662.98 |
| **Current Executive Chairman** | 7/8/2021 | S | 140,000 | $160.16 | $22,422,400.00 |
| | 10/13/2021 | S | 34,492 | $153.83 | $5,305,904.36 |
| | 10/13/2021 | S | 25,733 | $154.67 | $3,980,123.11 |
| | 10/13/2021 | S | 22,150 | $156.44 | $3,465,146.00 |
| | 10/13/2021 | S | 17,625 | $155.88 | $2,747,385.00 |
| | 11/2/2021 | S | 60,332 | $167.34 | $10,095,956.88 |
| | 11/2/2021 | S | 39,668 | $167.80 | $6,656,290.40 |
| | 11/3/2021 | S | 23,128 | $170.70 | $3,947,949.60 |
| | 11/3/2021 | S | 23,302 | $171.35 | $3,992,797.70 |
| | 11/3/2021 | S | 13,570 | $172.54 | $2,341,367.80 |
| | 12/30/2021 | S | 18,959 | $170.00 | $3,223,086.88 |
| | 1/7/2022 | S | 36,836 | $157.50 | $5,801,670.00 |
| | 1/7/2022 | S | 21,859 | $158.53 | $3,465,307.27 |
| | 1/7/2022 | S | 18,044 | $159.51 | $2,878,198.44 |
| | 1/7/2022 | S | 4,302 | $160.27 | $689,481.54 |
| | 1/26/2022 | S | 14,078 | $143.67 | $2,022,586.26 |
| | 1/26/2022 | S | 12,820 | $144.19 | $1,848,515.80 |
| | 1/26/2022 | S | 2,894 | $145.57 | $421,279.58 |
| | 1/26/2022 | S | 22,122 | $146.65 | $3,244,191.30 |
| | 1/26/2022 | S | 36,981 | $147.49 | $5,454,327.69 |
| | 1/26/2022 | S | 11,105 | $148.39 | $1,647,870.95 |
| | 2/14/2022 | S | 14,428 | $140.61 | $2,028,721.08 |
| | 2/14/2022 | S | 30,910 | $141.57 | $4,375,928.70 |

| | | | | | |
|---|---|---|---|---|---|
| | 2/14/2022 | S | 12,077 | $142.42 | $1,720,006.34 |
| | 2/14/2022 | S | 2,585 | $143.12 | $369,965.20 |
| | 4/6/2023 | S | 110,000 | $119.25 | $13,117,500.00 |
| | 5/12/2023 | S | 110,000 | $120.86 | $13,294,600.00 |
| | 7/18/2023 | S | 110,000 | $108.58 | $11,943,800.00 |
| | 10/16/2023 | S | 58,091 | $99.60 | $5,785,863.60 |
| | 2/14/2024 | S | 58,378 | $105.00 | $6,129,690.00 |
| | 2/14/2024 | S | 110,000 | $105.00 | $11,550,000.00 |
| | 5/14/2024 | S | 58,378 | $93.14 | $5,437,326.92 |
| | 5/14/2024 | S | 110,000 | $93.14 | $10,245,400.00 |
| | 7/18/2024 | S | 110,000 | $72.97 | $8,026,700.00 |
| | 8/14/2024 | S | 52,487 | $78.00 | $4,093,986.00 |
| | | **Total** | **1,661,428** | **Total** | **$208,679,987.38** |
| | | | | | |
| | | **Total (Sales)** | **2,089,152** | **Total (Sales)** | **$263,199,704.28** |

**NIKE's Fiduciaries Cause the Company to Repurchase Its Own Stock at Inflated Prices**

Despite their knowledge, or reckless disregard for, the Company's issues concerning the failing CDA strategy, NIKE's fiduciaries approved multiple stock repurchases at artificially inflated prices. While the price of the Company's common stock was inflated due to the false and misleading statements referenced above, NIKE's fiduciaries caused the Company to repurchase 143,031,744 shares of its own common stock for a total of $15.9 billion. Given that the price of NIKE's common stock on October 3, 2024, was $82.10 per share, the Company overpaid approximately $4,245,577,731 for the repurchased shares.

**Suspicious Departures**

The suspicious departures of Donahoe, Campion, and Lavu, senior executives responsible for the CDA strategy or its key components (like the DTC supply chain and technological capabilities), at key points support the need for this inspection. On February 20, 2023, Business Insider reported that Lavu had "resigned, effective immediately, according to an email sent to [NIKE] employees." Business Insider had obtained that internal email, which "did not give a reason for Lavu's departure." Similarly, NIKE gave Business Insider a one-sentence statement regarding this departure, stating only that "[w]e confirm that Ratnakar Lavu is no longer at Nike[.]" Lavu was responsible for overseeing the DTC technological capabilities and organization NIKE needed for establish for the CDA strategy to succeed.

On January 5, 2024, just over two weeks after the first disclosure on December 21, 2023, NIKE abruptly announced that Campion would exit NIKE effective April 5, 2024. From February 2020 until May 2023, Campion served as the Company's Chief Operating Officer. In that role, according to NIKE's February 18, 2020 press release announcing his appointment, Campion led NIKE's "global technology and digital transformation, sourcing and manufacturing, demand and supply management, distribution and logistics, procurement, sustainability and workplace design and connectivity." Subsequently, Campion served as the Company's Managing Director, Strategic

Business Ventures. In that role, according to the Company's May 24, 2023 press release announcing his appointment, Campion "[worked] closely with Donahoe to identify and pursue new business opportunities to drive disproportionate growth for the company." Therefore, Campion closely oversaw the major initiatives, including technological, supply chain, and DTC expansion, that were essential components of the CDA strategy.

On September 19, 2024, after three consecutive quarters of disappointing financial results and related disclosures about the failures of the CDA strategy, and only two weeks before the final disclosure of the truth on October 1, 2024, wherein the Company withdrew its financial guidance for the year, NIKE's Board announced the abrupt departure of Donahoe. He was widely regarded as the architect of NIKE's DTC shift as part of the CDA strategy. Specifically, NIKE disclosed that NIKE veteran Elliott Hill ("Hill") would replace Donahoe as President and CEO of NIKE effective October 14, 2024. In the announcement, Parker explained: "Given our needs for the future, the past performance of the business, and after conducting a thoughtful succession process, the Board concluded it was clear Elliott's global expertise, leadership style, and deep understanding of our industry and partners, paired with his passion for sport, our brands, products, consumers, athletes, and employees, make him the right person to lead NIKE's next stage of growth[.]" Donahoe's suspiciously-timed departure and Hill's appointment were tacit admissions that the CDA strategy had failed, and that Donahoe was to be held accountable, as Hill planned to reverse course on key failings of the CDA strategy. For example, in NIKE's September 19, 2024 press release announcing Donahoe's departure, NIKE highlighted Hill's goals included "delivering bold, innovative products" and "reconnect[ing]" with "trusted partners"—i.e., the wholesale partners that NIKE had abandoned as part of its DTC shift under the CDA strategy. Similarly, a September 20, 2024 article on Inc.com quoted Thomas Hayes, equity manager at Great Hill Capital that: "Hill is going to work on repairing some of Nike's relationships with wholesale customers since Nike has dropped some customers over the years and pulled back some product that has created some ill will (among retailers)[.]"

Our client is concerned that NIKE's fiduciaries: (i) sold Company stock at artificially inflated prices; (ii) repurchased NIKE stock at artificially inflated prices; and (iii) are responsible for apparently misleading the public and the Company's stockholders with the improper statements concerning the failed DTC business model and CDA strategy which artificially inflated the Company's stock price. Our client is also concerned that the Company lacked adequate and effective internal controls over its financial reporting regarding this information prior to this revelation.

## SPECIFIC DEMANDS FOR INSPECTION

In keeping with the proper purpose outlined above, Ms. McLaughlin demands to inspect the books and records specified below. In making this demand to inspect the Company's books and records, our client notes that her inspection demand must be construed as liberally and with as much latitude as is afforded under Oregon law. Our client intends that this demand cover the Company's "books and records" in whatever form they take, to the fullest extent provided under Oregon law. Further, the term "NIKE" or the "Company" includes NIKE's predecessors,

successors, divisions, and subsidiaries. All references to the "Board" in the request below shall mean the Board of NIKE. The term "Board" also includes any person, committee, or subcommittee acting on its behalf or in its stead. The time period for all requests is August 1, 2020 to the present, unless otherwise specified.

In particular, our client demands to inspect:

1. The Board books and records, including any minutes, resolutions, reports, presentations, or memoranda made, reviewed by, or provided to the Board, concerning:

a. the repurchase of NIKE stock;

b. revenue and gross margins, specifically through DTC and wholesale channels;

c. the DTC segment and the CDA strategy;

d. supply chains;

e. workforce reductions, driven by, related to, or affecting the CDA strategy;

f. NIKE's product pipeline;

g. market share and competitive standing;

h. agreements with Adobe to build out technological capabilities;

i. Lavu's, Campion's, and Donahoe's departures from the Company;

j. insider sales by the Insider Sellers;

k. the review, approval, or editing of the July 2021 10-K; October 5, 2021 10-Q; January 6, 2022 Form 10-Q; April 5, 2022 Form 10-Q; July 2022 10-K; October 6, 2022 Form 10-Q; January 5, 2023 Form 10-Q; April 6, 2023 Form 10-Q; July 2023 10-K; and July 2024 10-K;

l. the review, approval, or editing of the March 18, 2021 press release; June 24, 2021 press release; September 23, 2021 Form 8-K; November 18, 2021 press release; December 20, 2021 press release; March 21, 2022 Form 8-K; June 27, 2022 press release; September 29, 2022 press release; March 21, 2023 press release; May 24, 2023 press release; June 29, 2023 press release; December 21, 2023 press release; March 21, 2024 press release; June 27, 2024 press release; and October 1, 2024 press release; and

m. the review, approval, or editing of statements, talking points, or prepared comments made at the March 18, 2021 Earnings Call; April 26, 2021

University of California, Berkeley's Hass School of Business video; June 24, 2021 Earnings Call; September 23, 2021 Earnings Call; October 6, 2021 Annual Shareholder Meeting; December 20, 2021 Earnings Call; March 21, 2022 Earnings Call; March 30, 2022 Facebook post by Adobe Experience Cloud; May 16, 2022 WWD Articles; June 27, 2022 Earnings Call; September 9, 2022 Annual Shareholder Meeting; September 29, 2022 Earnings Call; December 20, 2022 Earnings Call; March 21, 2023 Earnings Call; June 29, 2023 Earnings Call; September 12, 2023 Annual Shareholder Meeting; September 28, 2023 Earnings Call; December 21, 2023 Earnings Call; March 21, 2024 Earnings Call; June 27, 2024 Earnings Call; and October 1, 2024 Earnings Call.

2. The communications to or from the Board concerning the topics in Demand No. 1.

3. The 10b5-1 trading plans for the Insider Sellers, operative between the Sales Period, including, without limitation, any modification or amendments to these plans.

4. Documents sufficient to identify the Company's internal controls, policies, and procedures in place to ensure NIKE's financial standing are adequately and timely reported to management and the Board.

5. Documents and communications sufficient to determine director independence and identify any potential conflicts of interest among Board members, including:

a. director questionnaires;

b. the selection process for new Board members;

c. the selection process for committee members;

d. related-party transactions; and

e. prior existing relationships among Board members.

6. The documents provided in response to any other demands investigating the same or similar matters identified in this demand.

## CONCLUSION

The books and records sought are described with reasonable particularity and directly relate to our client's proper purpose. We request that you respond to this demand no later than five business days after its receipt, so that we may arrange a mutually convenient time and place for us to inspect the above-mentioned books, records, and minutes of NIKE. If you need more time to produce the requested books, records, and minutes, we are amenable to discussing a reasonable

timeframe. In addition, we are willing to enter into an appropriate confidentiality agreement covering the documents our client will inspect.

If NIKE contends that this demand is incomplete or is otherwise deficient in any respect, please notify us immediately in writing setting forth the facts that the Company contends support its position and specifying any additional information believed to be required. In the absence of such prompt notice, we will assume that NIKE agrees that this demand complies in all respects with the requirements of Section 60.774.

We appreciate your diligent attention to this matter. Ms. McLaughlin looks forward to NIKE fulfilling its legal obligation to permit her to inspect the above demanded records. If you have any questions, please do not hesitate to contact us.

Sincerely,

Gregory E. Del Gaizo

1705117

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENT, that I, Margaret McLaughlin, hereby make, constitute, and appoint Gregory E. Del Gaizo of Robbins LLP, and any persons designated by him, to act as a true and lawful attorney-in-fact for me, in my name, place, and stead, in all matters regarding the examination of books and records of NIKE, Inc., and giving and granting unto said attorney full power and authority to do and perform all and every act and thing whatsoever requisite necessary and proper to be done in and without the premises, as fully, to all intents and purposes as I might or could do, with full power of substitution and revocation, hereby ratifying and confirming all that my attorney or the substitute shall lawfully do or cause to be done.

IN WITNESS WHEREOF, I have hereunto set my hand as of September 22, 2025.

____________________________
MARGARET MCLAUGHLIN

Virginia
STATE OF NEW JERSEY )
Prince William ) SS:
COUNTY OF MERCER )

Subscribed and sworn to (or affirmed) before me on this 22nd day of September, 2025, by Margaret McLaughlin, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature ________________________ (Seal) My Commission Expires 02/28/2027
Electronic Notary Public 8049360

COMMONWEALTH OF VIRGINIA • ELECTRONIC NOTARY PUBLIC
Mark Christopher Hewitt
REGISTRATION NUMBER
8049360
COMMISSION EXPIRES
February 28, 2027

Notarized remotely online using communication technology via Proof.

# OATH OF MARGARET MCLAUGHLIN

I, Margaret McLaughlin, being first duly sworn, hereby state and depose under penalty of perjury that:

I am a stockholder of NIKE, Inc., as evidenced by my account statement, a true and correct copy of which is attached hereto as Exhibit A.

I have reviewed the foregoing demand made pursuant to section 60.774 of the Oregon Revise Statutes, *et seq.* in substantially final form. The statements contained in the demand are true and correct to the best of my knowledge and belief.

I hereby affirm under penalty of perjury under the laws of the state of Oregon that the foregoing statements made by me are true and correct. Executed this 22 day of September, 2025, at Mercer County, New Jersey.

Margaret McLaughlin
MARGARET MCLAUGHLIN

Virginia
~~STATE OF NEW JERSEY~~ )
Prince William ) SS:
~~COUNTY OF MERCER~~ )

Subscribed and sworn to (or affirmed) before me on this 22nd day of September, 2025, by Margaret McLaughlin, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

My Commission Expires 02/28/2027

Signature Mark Christopher Hewitt (Seal)
Electronic Notary Public 8049360

COMMONWEALTH OF VIRGINIA • ELECTRONIC NOTARY PUBLIC • N

Mark Christopher Hewitt
REGISTRATION NUMBER
8049360
COMMISSION EXPIRES
February 28, 2027

Notarized remotely online using communication technology via Proof.

# Exhibit A

charles SCHWAB

Rollover IRA of

MARGARET M MCLAUGHLIN
CHARLES SCHWAB & CO INC CUST
IRA ROLLOVER

Statement Period
August 1-31, 2025

## Positions - Equities (continued)

| Symbol | Description | Quantity | Price($) | Market Value($) | Cost Basis($) | Unrealized Gain/(Loss)($) | Est. Yield | Est. Annual Income($) | % of Acct |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | |
| NKE | NIKE INC | 162.0000 | 77.37000 | 12,533.94 | 13,298.38 | (764.44) | 2.06% | 259.20 | [redacted] |
| [redacted] | | | | | | | | | |

## Positions - Exchange Traded Funds

| Symbol | Description | Quantity | Price($) | Market Value($) | Cost Basis($) | Unrealized Gain/(Loss)($) | Est. Yield | Est. Annual Income($) | % of Acct |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | |

Estimated Annual Income ("EAI") and Estimated Yield ("EY") calculations are for informational purposes only. The actual income and yield might be lower or higher than the estimated amounts. EY is based upon EAI and the current price of the security and will fluctuate. For certain types of securities, the calculations could include a return of principal or capital gains in which case EAI and EY would be overstated. EY and EAI are not promptly updated to reflect when an issuer has missed a regular payment or announced changes to future payments, in which case EAI and EY will continue to display at a prior rate.

## Transactions - Summary

[redacted]

[redacted] Other activity includes transactions which don't affect the cash balance such as stock transfers, splits, etc.

*Cash (includes any cash debit balance) held in your account plus the value of any cash invested in a sweep money fund.

Account [redacted]

**MARGARET M MCLAUGHLIN ROLLOVER IRA**
**TD AMERITRADE CLEARING, CUSTODIAN**

# MONTHLY STATEMENT

Reporting Period: **May 1 - 31, 2017**

**ROLLOVER IRA**

## HOLDINGS DETAIL *(continued)*

**STOCKS**

| Investment Description | Symbol/ CUSIP | Quantity | Closing Price | Market Value |
|---|---|---|---|---|
| [redacted] | | | | |
| NIKE INC CL B | NKE | 150 | 52.99 | 7,948.50 |
| [redacted] | | | | |

**Questions? Consult your Independent Advisor:**
DLK INVESTMENT MANAGEMENT (858) 433-3200

TD Ameritrade Institutional

Account [redacted]

**MARGARET M MCLAUGHLIN ROLLOVER IRA**
**TD AMERITRADE CLEARING, CUSTODIAN**

## MONTHLY STATEMENT

Reporting Period: **May 1 - 31, 2017**

**ROLLOVER IRA**

### TRANSACTIONS DETAIL *(continued)*

| Transaction Date | Settlement Date | Activity Type | Description | Symbol/ CUSIP | Quantity | Price | Transaction Amount |
|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | |
| 05/15 | 05/18 | Buy | NIKE INC<br>CL B | NKE | 150 | 53.79 | (8,074.45) |

**Questions? Consult your Independent Advisor:**
DLK INVESTMENT MANAGEMENT (858) 433-3200

TD Ameritrade Institutional

GIBSON DUNN

Brian M. Lutz
Partner
T: +1 415.393.8379
M: +1 917.679.9662
blutz@gibsondunn.com

October 7, 2025

VIA EMAIL

Gregory Del Gaizo
Robbins LLP
5060 Shoreham Pl., Ste 300
San Diego, CA 92122
gdelgaizo@robbinsllp.com

Re: Demand to Inspect Books and Records of NIKE, Inc. Pursuant to Oregon Revised Statute § 60.774

Greg:

As you know, my firm represents NIKE, Inc. ("NIKE" or the "Company") in connection with your letter dated September 23, 2025, on behalf of Margaret McLaughlin demanding to inspect certain books and records of the Company pursuant to Oregon Revised Statute Section 60.774, *et seq.*, ("Section 60.774") (the "Demand"). The Company appreciates your extension of its response deadline.

NIKE is committed to cooperating with its stockholders in responding to all books and records requests that comply with Oregon law. However, the Demand merely parrots vague and unadjudicated allegations from the pending securities class action *In re NIKE, Inc. Sec. Litig.*, No. 3:24-cv-00974-AN (the "Securities Class Action") and seeks documents that are plainly beyond the scope of Section 60.774, which limits stockholders to certain statutorily-defined records—indeed, Ms. McLaughlin's requests for "communications to or from the Board concerning the topics in Demand No. 1" and "[d]ocuments and communications sufficient to determine director independence," are just two examples that go well-beyond the categories Ms. McLaughlin is entitled to inspect under Section 60.774(2). Accordingly, the Demand does not comply with Oregon law.

Nevertheless, without conceding that the Demand complies with Oregon law, and reserving all rights, arguments and defenses regarding the Demand, NIKE is willing to engage further with Ms. McLaughlin regarding a possible production in response to the Demand upon entry into a mutually acceptable confidentiality agreement.

Please let me know if you would like to discuss further.

Sincerely,

Brian M. Lutz
Partner